Jane Gordon, ISB No. 9243
Jane Gordon Law
1004 West Fort Street
Boise ID 83702
Tel: (208) 391-4747
Email: Jane@JaneGordonLaw.com

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| ROBERT TEMPLIN, | CASE NO. 1:25-cv-00048-BLW |
| Plaintiff, | **DECLARATION OF JANE GORDON IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT** |
| vs. | |
| CENTURION OF IDAHO, LLC, *et al.* | |

Jane Gordon declares, under penalty of perjury, and states as follows:

1. I am one of the attorneys of record in this matter. I am over the age of 18 and I am a citizen of the United States. This declaration is based on my own personal knowledge.

2. Attached as Exhibit A is a red-lined copy of the Amended Complaint.

3. Attached as Exhibit B is a clean copy of the First Amended Complaint with its own Exhibit, the Centurion Idaho Provider Manual.

DATED: November 10, 2025.

**JANE GORDON LAW**

*/s/ Jane Gordon*
Jane Gordon
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2025, I served the foregoing pleading on the following parties via ECF:

Michael J. Elia
Nathan C. Beckman
MOORE ELIA KRAFT & STACEY, LLP
mje@melawfirm.com
ncb@melawfirm.com

Andy Brassey
BRASSEY CRAWFORD, PLLC
acb@brassey.net

*/s/ Jane Gordon*
Jane Gordon

Jane Gordon, ISB # 9243
Jane Gordon Law
1004 West Fort Street
Boise, ID 83702
Tel: (208) 371-4747; Fax: (208) 807-2290
Jane@JaneGordonLaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT TEMPLIN, | CASE NO. 1:25-cv-00048-BLW |
| Plaintiff, | FIRST AMENDED COMPLAINT |
| vs. | |
| JOSH TEWALT, in his capacity as director of the Idaho Department of Corrections, et al., | |
| Defendants | |
| ROBERT TEMPLIN, | |
| Plaintiff, | |
| vs. | |
| JOSH TEWALT, in his official capacity as the Director of the Idaho Department of Corrections; TIM RICHARDSON; in his official and his individual capacity; RANDY VALLEY, in his official and his individual capacity; RONA SIEGERT, in her official and her individual capacity; MHM SERVICES dba CENTURION HEALTH; CENTURION OF IDAHO, LLC; JAMIE AYUSO, an individual; CONNIE SMOCK, an individual; WILLIAM ROGERS, an individual; ASHLEY RINO, an individual; JOHNNY WU, an individual; CHRISTINA JACKSON, an individual; REX UNDERWOOD, an individual; REBECCA BALLARD, an individual; KYLE WAGNER, an individual; CHANDRA KING, an individual, CHRIS JOHNSON, an individual; | |


EXHIBIT A

~~TERISSA PETERSON, an individual;~~
~~WENDY ORM, an individual; CODY~~
~~NIECKO, an individual; BRIAN CROWL, an~~
~~individual; CRYSTAL WILCOX, an~~
~~individual; STACEY SCROBE, an individual,~~

~~Defendants.~~

This is a civil rights case brought under 42 U.S.C. § 1983 arising out of Defendants' deliberate indifference to Plaintiff Robert "Bobby" Templin's serious medical condition, including serious pain, injury and suffering, future pain, injury and suffering, and permanent damage and disability to his hand, mental anguish, and future lost income. Bobby, ~~a currently~~ formerly incarcerated ~~prisoner~~, seeks relief for injuries he sustained while he was in custody of the Idaho Department of Corrections.

Bobby's thumb was badly broken and dislocated. He was not transported for emergency care. For several months, prison medical officials unreasonably delayed imaging and treatment. After five months, Bobby was finally sent for advanced imaging. It took seven months to see an orthopedic specialist. Unfortunately, due to lack of treatment and care, his thumb healed in a deformity. He now suffers near constant pain and swelling in his thumb and hand, as well as a significant loss of grip strength and range of motion.

Because of his thumb, he ~~needs~~ needed to be placed in handcuffs in the front of his body, or use double handcuffs to alleviate the pressure on his wrist from having his hands fixed behind his back. Prison and medical officials ignored ~~the~~ Bobby's medical ~~handcuff~~ order ~~requirement,~~ regarding handcuffs, further contributing to his pain and suffering. Defendants have acted, and continued to act, with deliberate indifference to Bobby's serious medical needs~~,~~ and to the substantial risk of serious harm ~~to Plaintiff~~. He seeks relief from this court.

Plaintiff brings this Amended Complaint against Josh Tewalt, ~~-~~MHM Services dba

Centurion Health, Centurion of Idaho, LLC, Tim Richardson, Randy Valley, Rona Siegert, Connie Smock, Cody Nieko, Chris Johnson, Rebecca Ballard, Christina Jackson, Rex Underwood, Chandra King, Johnny Wu, Stacey Scrobe, and Crystal Wilcox.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction and venue over the subject matter of this complaint under 42 U.S.C. § 1983; 28 U.S.C. § 1331 and § 1343(a)(3); 28 U.S.C. § 2201 and § 2202; 28 U.S.C.§ 2283 and § 2284.

2.      Section 1983 authorizes civil actions for the "deprivation of any rights ... secured by the Constitution and laws" against a party acting under color of state law. 42 U.S.C. § 1983.

## PARTIES

3.      Plaintiff Robert Templin ("Bobby") has been in the legal care and custody of the Idaho Department of Correction ("IDOC") since 2022. Bobby has been released from custody since the filing of the original Complaint.

4.      Josh Tewalt is the former current IDOC Director. IDOC is the Idaho state agency responsible for the incarceration of inmates and operates the Idaho State Correctional Center ("ISCC") and IMSI. As director, he is wasresponsible for IDOC operations, including the policies, procedures, and practices followed by IDOC, its contractors, and its agents. Tewalt is also the final reviewer of medical decisions by IDOC's Management and Treatment Committee. He is sued in his personal capacity for damages. and professional capacity for injunctive relief.

5.      Defendant MHM Services dba Centurion Health is a corporation headquartered in Virginia. It contracts with IDOC to provide medical care and treatment to its residents. Centurion

Health fulfils a traditional state function of providing medical care and treatment for prison residents.

6.      Defendant Centurion of Idaho, LLC is a limited liability company organized under the laws of Idaho and contracts with IDOC to provide medical care and treatment to all IDOC residents. It fulfils a traditional state function of providing medical care and treatment for prison residents. Both Centurion of Idaho, LLC and Centurion Health, Inc. are referred to as "Centurion."

7.      Tim Richardson ("Defendant Richardson") is the IMSI Warden. He is responsible for the care and medical treatment of all IMSI residents. He is the appellate authority for grievances. He has supervisory authority over IDOC and Centurion employees. He is sued in his personal capacity for damages. and his official capacity for injunctive relief requiring the provision of proper medical treatment.

8.      Randy Valley ("Defendant Valley") is the ISCC Warden. He is responsible for the care and medical treatment of all ISCC residents. He is the appellate authority for grievances. He has supervisory authority over IDOC and Centurion employees. He is sued in his personal capacity for damages. and his official capacity for injunctive relief requiring the provision of proper medical treatment.

9.      Rona Siegert, RN ("Defendant Siegert") is IDOC's Health Services Director. She monitors and oversees all aspects of healthcare services. Her duties include ensuring the contract medical provider complies with all applicable laws, rules, and regulations. She is the appellate authority for any grievance that involves complaints about medical providers and care. She is sued in her individual capacity for damages. and official capacity for injunctive relief.

10.      Lieutenant Jamie Ayuso is employed by IDOC as a correctional and shift

commander. She is sued in her individual capacity.

11.10.  Connie Smock, RN ("Defendant Smock") is employed by IDOC or Centurion as a Nurse Manager. She is sued in her individual capacity.

12.11.  Lieutenant Cody Nieko ("Defendant Lt. Nieko") is employed by IDOC as a correctional officer. He is sued in his individual capacity.

13.    Brian Crowl is employed by IDOC as a correctional officer. He is sued in his individual capacity.

14.    Kyle Wagner is employed by Centurion as a health services administrator. He is sued in his individual capacity.

15.12.  Chris Johnson ("Defendant Johnson") is employed by Centurion as a health services administrator. He is sued in his individual capacity. He responded to many of Bobby's Resident Concern Forms. As a health services administrator, Johnson was responsible for overseeing the delivery of medical services at IDOC, and for establishing formal relationships with community hospitals, specialists, ground/emergency transport services, and others as needed.

16.13.  Rebecca Ballard, MD ("Defendant Ballard") is a medical doctor employed by Centurion to provide medical treatment to IDOC residents. She is sued in her individual capacity for damages.

17.    William Rogers, NP is a nurse practitioner employed by Centurion to provide medical treatment to IDOC residents. He is sued in his individual capacity.

18.    Ashley Rino, RN is the statewide director of nursing for Centurion. She is sued in her individual capacity for damages.

19.14.  Christina Jackson, RN ("Defendant Jackson") is employed by Centurion to

provide medical services to IDOC residents. She is sued in his individual capacity.

20.15.  Rex Underwood, NP. ("Defendant Underwood") is employed by Centurion to provide medical services to IDOC residents. He is sued in his individual capacity.

21.16.  Chandra King, FNCP ("Defendant King"), is employed by Centurion to provide medical services to IDOC residents. She is sued in herhis individual capacity.

22.17.  Johnny Wu, MD ("Defendant Wu") is a doctor employed by Centurion to provide medical services to IDOC residents. He is sued in his individual capacity.

23.    Terissa Peterson, RN is the director of nursing at Centurion Health. She is sued in her personal capacity.

24.18.  Stacey Scrobe, RN ("Defendant Scrobe") is a nurse at Centurion Health. She is sued in her personal capacity.

25.19.  Crystal Wilcox, RN ("Defendant Wilcox") is a nurse at Centurion Health. She is sued in her personal capacity.

26.    Wendy Orm, MD is a doctor at IDOC employed by Centurion. She is sued in her personal capacity.

27.20.  IDOC Does 1 -5 are Idaho Department of Correction employees, whose identities are currently unknown to Plaintiff, who are responsible for off-site scheduling of medical appointments for residents within the IDOC. They are sued in their individual capacities for unreasonable scheduling delays.

28.21.  Centurion John and Jane Does 1 – 5 are Centurion local, regional, or national administrative employees whose identities are presently unknown to Plaintiff. These Does have decision-making authority to approve or deny care requested by an on-site medical provider. As

such they are responsible for Mr. Templin's medical care. They are sued in their individual capacities for damages and official capacities for injunctive relief.

29.22.   At all times relevant hereto, Defendants were acting under the color of state law.

**FACTS**

23.     On January 29, 2023, while at ISCC, Bobby's thumb was broken during a "large scale altercation." Upon information and belief, Warden Valley and Warden Richardson knew about this altercation, who was involved, and the injuries that resulted.

30.24.  Templin Bobby first received imaging (an x-ray) for his hand on January 31, 2023 at IDOC. That imaging showed a "comminuted, displaced, intra-articular fracture of the thumb metacarpal base." The distal portion of the fracture was laterally displaced by 3.5 mm. Thumb fractures with a displacement greater than 3 mm generally need to be repaired using an open reduction and internal fixation, meaning using surgery to place hardware to fix the bones in place while they heal. The fracture extended into the articular surface and had a step-off of less than 2 mm. He was not referred to emergency care or to a specialist.

31.25.  Soon after his thumb was broken, and because of the "altercation," Bobby Templin was moved to IMSI, where he was housed until his release. he is currently housed.

32.26.  While seeking medical treatment, Bobby sent Health Services Requests ("HSRs"), Resident Concern Forms, and filed grievances, and appeals, kites to or otherwise interacted with the following IDOC and Centurion employees: Tim Richardson; Randy Valley; Rona Siegert, RN; Lt. Jamie Ayuso; Connie Smock, RN; Lt. Cody Niecko; Sgt. Brian Crowl; Kyle Wagner; Chris Johnson; Rebecca Ballard, MD; William Rogers, NP; Christina Jackson, RN; Rex Underwood, NP; Ashley Rino, RN; Stacey Scrobe, RN; Crystal Wilcox, RN; Chandra King, RN; Johnny Wu, MD; Terissa Peterson, RN; Wendy Orm, MD; and Doe Centurion Employees and IDOC

Employees. The foregoing individuals were all involved in making medical decisions for Bobby and had the responsibility and ability to ensure that Bobby could access timely medical treatment pursuant to IDOC and Centurion's contract, policies, and procedures.

27.    Centurion, as the contract medical provider, and its employees, ~~is~~ are responsible for implementing and practicing all of IDOC's Standard Operating Procedures and the National Commission on Correctional Health Care ("NCCHC") standards.

28.    Pursuant to the Centurion of Idaho Provider Manual, **All Centurion on-site practitioners are responsible for requesting specialty care.** Every single Defendant had the responsibility and the ability to request a visit for Bobby to see specialist. *See* First Amended Complaint, Exhibit A.

29.    Pursuant to the Centurion of Idaho Provider Manual, **All Centurion on-site practitioners are responsible for requesting emergency care.** Every single Defendant had the responsibility and the ability to request emergency care for Bobby. *See* First Amended Complaint, Exhibit A.

30.    Pursuant to the Centurion of Idaho Provider Manual, Centurion and IDOC have internal timeliness standards for when specialists must be seen after a referral is placed. *See* First Amended Complaint, Exhibit A. Upon information and belief, Bobby's visit to a specialist was outside those timeliness standards.

~~33.~~31. Upon information and belief, Defendant Smock, as Director of Nursing, is supposed to serve as a resource on policies and procedures, ensure that Centurion is in compliance with its contract to provide health care services to IDOC, supervise and train IDOC and Centurion staff on policies and procedures regarding resident health services, and monitor operations. She is responsible for planning, coordinating, directing, and supervising the clinical program providing

services to patients. Her deliberate failure to act was a ratification of Bobby's lack of appropriate medical attention.

34.32.  IDOCWarden Valley and Warden Richardson are is responsible in ensuring that Centurion is following its Standard Operating Procedures and adopted standards from the NCCHC.

35.33.  Centurion and its employees are responsible for scheduling appointments for the offender to meet with the appropriate medical practitioner in a timely manner in accordance with its own policies.

36.34.  Centurion's Health Administrators are responsible for ensuring that sufficient medical staff is hired, present, and fulfilling their duties to Centurion's IDOC patients. They are also responsible for training staff. They have the ability to develop medical policy and ensure implementation in accordance with their policies and procedures..

37.35.  Centurion's Health Administrators failed to devise or enforce policies and procedures that would ensure Bobby's adequate medical care and support. They failed to ensure that Bobby was timely scheduled with a provider who could properly assess and treat his hand injury. They failed to ensure that he would be able to could access physical therapy. They failed to ensure that prescribed Celebrex is available. These failures are in despite of the fact that it was routine treatment within the standard of care for the community for this injury.

38.36.  The Centurion medical providers at ISMI who were responsible for Bobby's care failed to expeditiously schedule an appointment with a specialist, or follow up expeditiously to ensure that a follow-upan appointment was scheduled. This failure to timely see a specialist caused a permanent deformity of his hand.

37.     IDOC employees failed to expeditiously schedule an appointment with a specialist, or follow up expeditiously to ensure that a follow-up appointment was scheduled. This failure to

timely see a specialist caused a permanent deformity of his hand.

~~39.~~

~~40.~~38.  Bobby sent Resident Concern Forms, ~~Health Services Requests~~HSRs, ~~and greivances~~filed Grievances and Appeals on a continual basis to Defendants regarding IDOC and Centurion's failures to address his medical condition and lack of treatment and follow their own policies and procedures~~.~~

**<u>Medical History</u>**

39.    On January 31, 2023, Rebecca Ballard, MD evaluated Bobby. She confirmed the x-ray ~~shows~~showed a displaced thumb fracture. Her plan notes state "[i]mmobilize and refer to hand surgery/ortho asap." Dr. Ballard did immobilize Bobby's hand.~~ ~~ Upon information and belief, she did not place any referrals for Bobby to see a specialist.

~~41.~~40.  Dr. Ballard also had the ability and the authority to send Bobby to the emergency department for immediate medical treatment as the x-ray showed Bobby had a displaced fracture. She did not. Dr. Ballard~~She~~ did not follow up with anyone to ensure that Bobby was actually seen by an orthopedic specialist or that ~~it was~~an appointment with a specialist was actually scheduled.

~~42.~~41.  On February 3, 2023, Nurse Wilcox evaluated Bobby's health service request, recording that he "has urgent consult for ortho due to thumb fracture." Nurse Wilcox did not follow up with anyone to ensure that Bobby was actually seen by an orthopedic specialist or that it was actually scheduled. Nurse Wilcox, despite acknowledging that Bobby's broken thumb was urgent, and despite it being within her responsibilities and abilities, did not have him transported to an emergency department. Upon information and belief, she did not schedule an appointment with a specialist.

~~43.~~42.  On February 9, 2023, Bobby ~~was seen~~saw ~~by ~~Rex Underwood, ARNP, who

reviewed Bobby's x-ray showing the displaced fracture, noted that Bobby was in a splint, and that a hand specialist consult was placed. ~~It does not appear that Underwood ever followed up to ensure that the hand specialist consult happened.~~ Underwood did not place a referral for a specialist, he did not follow up to ensure Bobby saw a specialist in a timely manner, nor did he have him transported to an emergency department for his displaced fracture, despite having the authority to do so pursuant to Centurion's Provider Manual.

44.43.  Defendant ~~Nurse~~ Wilcox saw Bobby again on February 10, 2023, she documented that his fingers and hand ~~are~~ were cold to the touch and Bobby reported numbness in his fingers. She wrapped his hand with ace wrap. Coldness and numbness can indicate severe problems with circulation or nerve damage. She failed to have Bobby transported to an emergency department or referred to a specialist, even though these were new and potentially serious symptoms. ~~She did not follow up to ensure that he saw an orthopedic specialist.~~

45.44.  On February 11, 2023, Bobby sent a Resident Concern Form to Medical stating, "I've been in the hole now 14 days with a broken hand. My hand is only getting worse without the medical care I need." Health Services Administrator Defendant Johnson told Bobby "we are working to get you scheduled with a specialist."

45.    On February 11, 2023, Bobby also sent a Resident Concern Form to ~~Warden~~ Defendant Valley stating, "14 days ago my hand was broken so severely that medical here at ICC can't fix it. A medical told me I have to go to a hospital or surgeon for medical care. Two weeks and I still haven't been transported to get the medical attention I need." Defendant Valley, contrary to IDOC and Centurion's policies and procedures, failed to take any action.

46.    On February 11, 2023, Samantha Wood, Bobby's friend emailed Defendants Smock, Siegert, and Tewalt and the general ISCC email address to explain that Bobby was 13 days

without any appropriate medical treatment. Contrary to IDOC and Centurion's policies and procedures, Defendants Smock, Siegert, and Tewalt failed to take any action in response to Ms. Wood's notice.

46.    Bobby's father contacted Defendants Valley and Smock several times to ask for help for Bobby's hand. Defendant Smock was the director of nursing and her responsibility was to monitor the healthcare contract and compliance. Defendants Valley and Smock, contrary to IDOC and Centurion's policies and procedures, failed to take any action after receiving notices from Bobby's father.

47.    On February 20, 2023, upon information and belief, Defendant Nurse Jackson told Bobby that they were trying to get him into surgery for his hand. She evaluated him in his cell, where Bobby reported numbness and a decreased range of motion in his index finger. Defendant Nurse Jackson told Bobby to leave his splint on and elevate the hand. She did not order a specialist consult, or follow up to ensure he was being seen by a specialist. She did not request transportation to the emergency department, despite having the authority to do so, at these new symptoms of reduced range of motion.

48.    St. Luke's appeared to have received a referral for Bobby to see an orthopedic specialist on February 3, 2023, the next entry in the St. Luke's file was May 19, 2023. There does not appear to be any contact between IDOC, Centurion, and St. Luke's between February 3 and May 19, 2023.

49.    On February 24, 2023, a mental health counselor evaluated Bobby for a progress note and found, "PT appears to be experiencing increased mental health symptoms congruent to anxiety due to his physical health."

50.    On February 25, 2023, Bobby sent a Resident Concern Form to the Medical

Director of Nursing Defendant Siegert stating "my hand has been broken now for 30 days. This is caused serious difficulty in daily living. Also, I am in constant fear that if not repaired now I will lose mobility in my hand, seriously affecting hand function. The repair of my hand is medically necessary. I am in chronic pain and anxiety due to my hand injury."

50.51.  Health Services Administrator Defendant Johnson told Bobby, seemingly unconcerned, "We have now been able to find you a provider to see you for your hand." Defendant Johnson did not follow up with a specialist or do anything to expedite Bobby seeing a specialist. As the Health Services Administrator, Defendant Johnson was responsible for overseeing the delivery of medical services at IDOC, and for establishing formal relationships with community hospitals, specialists, ground/emergency transport services, and others as needed.

51.52.  On February 27, 2023, Bobby was told that an offsite appointment had been scheduled.

52.53.  On March 1, 2023, Defendant Dr. Wu examined Bobby's hand and recognized that Bobby should have had surgery. Again, Defendant Dr. Wu did not send a referral to a specialist, did not contact a specialist to expedite Bobby's appointment, did not confirm if the specialist appointment ensure that an appointment with a specialist was actually scheduled or follow up to ensure the appointment happened, despite having the authority to do so.

53.54.  On March 5, 2023, Bobby sent a HSR to DefendantNurse Smock asking for help with his hand and to "please help." Defendant Nurse Smock responded that if Bobby wants an update, to send an HSR to Nurse Practitioner Rogers instead. Defendant Smock had supervisory authority and it was her responsibility to ensure that procedures and policies were being followed, including that Centurion employees were appropriately handling referrals to specialists and emergency departments. Defendant Smock did not ensure that any of the other Defendants were

appropriately handling Bobby's injuries. Defendant Smock had notice that Bobby was injured and was not getting appropriate medical treatment. Defendant Smock's failure to act, contrary to IDOC and Centurion policies and procedures, ratified Bobby's failure to receive medical treatment.

55.    On March 7, 2023, Health Services Administrator Defendant Johnson again told Bobby he was scheduled with an orthopedist. Bobby eventually filed a Grievance and Defendant Johnson reviewed and responded to the Grievance.

54.56.  Bobby's criminal defense attorney emailed Defendants Tewalt, Smock, and Seigert on March 8, 2023 to demand that Bobby be seen immediately by an orthopedic surgeon to avoid permanent disability and disfigurement. Defendants Tewalt, Smock, and Seigert again had notice that Bobby was not getting appropriate medical treatment for his hand, contrary to IDOC and Centurion's policies and procedures. Upon information and belief, Defendants Tewalt, Smock, and Seigert did not take any action regarding Bobby's injury, ratifying the delay and denial of appropriate medical treatment.

55.57.  On By March 14, 2023, Bobby saw Nurse Practitioner Rogers, who reviewed the January x-ray and did not refer him to emergency medical care. The the medical record reflects that Bobby had sent in at least 14 Health Services Requests ("HSRs") at that point relating to his hand.

56.58.  On March 30, 2023, Bobby asked via a Resident Concern Form why he was not receiving replies to his grievances, as the time had expired for a response, he was told that "medical is slowly working through grievances." IDOC has a policy regarding the time limit to respond to grievances, which was not being followed.

57.59.  On April 6, 2023, upon information and belief, Nurse Practitioner Rogers evaluated Bobby's hand for swelling and remarked that Bobby "fell through the cracks somewhere" regarding the long wait for medical treatment.

58.60.  On May 10, 2023, Nurse King examined Bobby's hand. She recorded "patient has limited mobility of his right thumb, unable to close and grasp my finger in hand. Unable to bring thumb to any of the other digits. The palm under the 1st digit is swollen without pitting or erythema. Unable to extend his first digit out. He is able to flex and extend digits 2-5 with some coaxing. PROM of digits 2-5 WNL" Despite her observations, she did not escalate his need for seeing an orthopedic specialist. She told him to keep his hand elevated. She did not do anything to ensure he could see a specialist or follow up to ensure an appointment was scheduled. She did not address her findings with a supervisor, even though Bobby's hand showed increasing swelling and decreased grasp.

61.    Due to Defendants' failure to follow their own policies and procedures, short staffing, failure to train, failure to supervise, failure to follow all standards for emergency treatment, or other incompetencies, Bobby has suffered delays in the grievance process and getting appropriate medical treatment.

59.62. Defendants purposefully, intentionally and recklessly have a history, custom, policy, and practice of denying, delaying, ignoring, and improperly responding to inmate medical requests and not taking proper and timely actions to prevent needless pain and injuries caused by serious medical condition.

**Orthopedic Specialist**

60.63.  Ultimately, Bobby did not have a CT scan until June 30, 2023, and was not seen by an orthopedic specialist until July 25, 2023, seven months after this thumb was broken. At that point, the bone had healed in a deformity and could no longer be repaired absent additional invasive procedures, such as thumb fusion surgery.

61.64.  Dr. Judd, an board certified orthopedic hand specialist at St. Luke's, diagnosed

Bobby with a right thumb metacarpal intra-articular base fracture, also known as a Bennett fracture, which had "healed with a deformity." Bennett fractures are generally surgical and can require hardware to encourage proper healing.

62.65.  When a Bennett fracture does not heal properly, it causes deformity of the thumb with loss of range of motion and loss of grip strength. ~~Bobby is unable to ascertain the extent and permanency of his injury because he is unable to get the medical treatment he needs due to being incarcerated.~~ Now, Bobby has a significant decrease in strength, ability, and range of motion in his right hand compared to his left.

63.    On December 12, 2023, upon information and belief, Dr. Judd discouraged surgery to fix Bobby's thumb because of IDOC and Centurion's failure to ensure patients attend post-operative appointments.

66.

64.    Surgery to repair the deformity is not guaranteed to restore Bobby's range of motion ~~or~~ and grip strength or decrease or stop the pain and swelling.

65.    The injury has caused a marked decrease in Bobby's grip strength in his right hand. He has lost significant range of motion in his hand and wrist.

66.67.  Bobby's right hand and wrist are continuously swollen and painful.

67.68.  Dr. Judd prescribed Celebrex for Bobby's hand. There was a significant delay in Bobby starting the medication.

**Front Cuff Order**

68.69.  Both Dr. Orm (a Centurion doctor) and Dr. Judd provided Bobby with a front cuff order to mitigate the pain and swelling in his hand and wrist. Defendants ~~His~~ Lt. Neicko and Scrobe discontinued Bobby's front cuff memo ~~was discontinued by Lt. Neicko and Nurse Scrobe on~~

March 7, 2024 ~~for unknown reasons.~~ , contradicting the orders of two medical doctors.

70.    Instead of a front cuff, IDOC employees could alternately use two sets of handcuffs, or "double cuff" Bobby, ~~which they are not doing.~~which Defendants failed to do.

~~69.~~71.  Using cuffs behind Bobby's back caused unnecessary pain, swelling and discomfort in Bobby's hand. Bobby's thumb/wrist healed in a way that prevents him from bending his hand and wrist normally and he has a greatly decreased range of motion. Using front cuffs or double-cuffing Bobby would have allowed Bobby's hand to be at a more natural angle, decreasing swelling, pain, and discomfort.

**Bobby's Current Status**

~~70.~~72.  Bobby ~~continues~~ continued to send HSRs, Resident Concern Forms, and Grievances in an attempt to obtain physical therapy or other medical treatment that could alleviate the pain and swelling he suffers in his right hand. However, the damage has largely been done as his thumb has healed with a deformity.

~~71.~~73.  Now, because of the injury to his right hand, Bobby needs future medical treatment, has suffered permanent impairment and deformity, has lost access to the labor market, and has lost access to future wages. He has also suffered non-economic damages, including incredible anxiety from having a permanent disability, and pain and suffering.

~~72.~~74.  Prior to incarceration, Bobby worked in construction. Due to the deformity on his dominant hand, his ability to work in construction has diminished. He has decreased range of motion, decreased grip strength, and decreased ability to hold items. This has caused Bobby a loss in access to the labor market upon his release and future lost earnings.

~~73.~~75.  Bobby had to obtain the services of an attorney for this case and hired Jane Gordon Law.

**CLAIMS FOR RELIEF**
**Eighth and Fourteenth Amendments 42 U.S.C. § 1983**
**Cruel and Unusual Punishment – Delay and Denial of Medical Care**

74.76.  Defendants were acting under the color of state law.

75.77.  Bobby's broken thumb was -- and continues to be -- a serious medical need.

76.78.  Each and every Defendant was deliberately indifferent to Bobby's broken thumb and the resulting pain.

79.     Each and every Defendant knew of his serious medical condition and disregarded it by failing to take any reasonable measures to address it.

80.     Each and every Defendant ignored IDOC and Centurion policies, practices, and procedures regarding inmate medical treatment.

81.     Defendants Valley and Richardson were responsible for ensuring IDOC and Centurion employees were trained in IDOC and Centurion policies and practices and that IDOC and Centurion employees followed IDOC and Centurion policies and practices. They failed to ensure their employees followed IDOC and Centurion policies and practices

82.     Upon information and belief, Defendants Valley and Richardson had notice of Bobby's injury and failure to receive medical attention as they knew about the underlying "altercation" (and the injuries sustained therein) that caused Bobby's transfer from ISMI from ISCC. Pursuant to IDOC policy and procedures they were informed of the "large scale group disruption," injuries sustained, and inmate transfers between facilities.

83.     Upon information and belief and pursuant to IDOC policy and procedures, Defendants Valley and Richardson are both appellate authorities for the grievance process. Bobby filled out at least eight Grievances and Appeals, mostly to IMSI and one to ISCC. Defendant Valley was specifically addressed in a grievance and in a minimum of two emails

regarding Bobby's situation. Against IDOC policy and procedure, neither Defendant Valley nor Defendant Richardson took any action, r ratifying the denial and delay of Bobby's medical treatment.

77.84.  Defendants Siegert and Smock both had the duty to supervise, train, and ensure the medical staff was providing appropriate medical care in accordance with the IDOC and Centurion policies and procedures. When informed about Bobby's lack of appropriate medical treatment, neither Siegert or Smock took any action, ratifying the denial and delay of Bobby's medical treatment.

78.85.  As ofOn January 31, 2023, when Bobby  he was initially evaluated and x-rayed by IDOC/Centurion medical staff and imaging showed that his thumb fracture had a 3.5 mm displacement, Bobby should have been taken to emergency medical treatment. Even Dr. Ballard said the matter was urgent.

79.86.  The weeks following his x-ray presented many opportunities for Defendants to take Bobby to seek emergency medical treatment to save his hand. Instead, they waited until his fracture was healed in a deformity before taking him to see a specialist.

87.     Defendants failed to ensure that Bobby was actually going to a specialist for medical treatment. Defendants failed to ensure that an appointment with a specialist was actually scheduled. Defendants failed to expeditiously have Bobby seen by a specialist. Defendants failed to get Bobby emergency treatment, even though it was well within their authority, pursuant to IDOC and Centurion's policies and procedures.

80.

81.88.  Defendants further contributed to Bobby's injury by refusing to use front handcuffs or use double handcuffs while his hands are behind his back, despite an order from a

medical doctor to do so. This exacerbates the swelling and pain in his hand due to the angle that the handcuffs force his wrists into.

89.    Bobby should not have had to wait seven months to see an orthopedic specialist. It was deliberate indifference to not seek immediately medical attention and to continuously and intentionally and recklessly delay and fail to schedule an appointment with a hand specialist. and fail to respond to request for necessary treatment to alleviate Bobby's pain and suffering and ongoing injury.

90.    Defendants purposefully, intentionally and recklessly have a history, custom, policy, and practice of denying, delaying, ignoring, and improperly responding to inmate medical requests and not taking proper and timely actions to prevent needless pain and injuries caused by a serious medical condition.

91.    Defendants did not properly supervise the medical staff and treatment that was requested and not provided to Bobby and thereby encouraged, condoned and ratified the denial of necessary medical treatment of serious medical conditions and the infliction of needless pain and injuries upon Plaintiff.

92.    Plaintiff was forced to experience pain and suffered emotional distress, mental anguish, physical disability, disfigurement and permanent impairments due to Defendants' failure to timely respond, examine, and treat Plaintiff's serious, medical condition and the failure to reasonably and promptly transfer Plaintiff to a hospital.

82.

93.    This deliberate indifference caused severe harm to Bobby.

83.

**PRAYER FOR RELIEF**

1.      WHEREFORE, Plaintiff Robert Templin respectfully prays this Court enter

judgment granting him the following:

2.      A declaration that the acts and omissions set forth herein violated Plaintiff's rights

under the Constitution and the laws of the United States.

3.      Injunctive relief ordering Defendants or their successors to provide Plaintiff with

effective treatment for his serious medical condition.

4.      Compensatory damages against each Defendant in the amount to be determined at

trial, jointly and severally, against each Defendant for serious pain, suffering,

unnecessary physically injury, disability, deformity, mental anguish, loss of

access to the labor market and future lost wages.

5.      Punitive damage against each Defendant in the amount to be determined at trial.

6.      A jury on all triable issues.

7.      Attorney's fees, costs, and expenses under 42 USC § 1988 and all relevant

statutes and rules.

8.      Any additional relief this Court deems just, proper, and equitable.

DATED ~~JANUARY 27~~November 10, 2025.

JANE GORDON LAW

*/s/ Jane Gordon*
Jane Gordon, of the firm
Attorney for Plaintiff

Jane Gordon, ISB # 9243
Jane Gordon Law
1004 West Fort Street
Boise, ID 83702
Tel: (208) 371-4747; Fax: (208) 807-2290
Jane@JaneGordonLaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT TEMPLIN,<br><br>　　　Plaintiff,<br><br>　　vs.<br><br>JOSH TEWALT, in his capacity as director of the Idaho Department of Corrections, et al.,<br><br>　　　Defendants | CASE NO. 1:25-cv-00048-BLW<br><br>FIRST AMENDED COMPLAINT |

This is a civil rights case brought under 42 U.S.C. § 1983 arising out of Defendants' deliberate indifference to Plaintiff Robert "Bobby" Templin's serious medical condition, including serious pain, injury and suffering, future pain, injury and suffering, and permanent damage and disability to his hand, mental anguish, and future lost income. Bobby, formerly incarcerated, seeks relief for injuries he sustained while he was in custody of the Idaho Department of Corrections.

Bobby's thumb was badly broken and dislocated. He was not transported for emergency care. For several months, prison medical officials unreasonably delayed imaging and treatment. After five months, Bobby was finally sent for advanced imaging. It took seven months to see an orthopedic specialist. Unfortunately, due to lack of treatment and care, his thumb healed in a

FIRST AMENDED COMPLAINT - 1

EXHIBIT B

deformity. He now suffers near constant pain and swelling in his thumb and hand, as well as a significant loss of grip strength and range of motion.

Because of his thumb, he needed to be placed in handcuffs in the front of his body, or use double handcuffs to alleviate the pressure on his wrist from having his hands fixed behind his back. Prison and medical officials ignored Bobby's medical order regarding handcuffs, further contributing to his pain and suffering. Defendants have acted, and continued to act, with deliberate indifference to Bobby's serious medical needs and to the substantial risk of serious harm. He seeks relief from this court.

Plaintiff brings this Amended Complaint against Josh Tewalt, MHM Services dba Centurion Health, Centurion of Idaho, LLC, Tim Richardson, Randy Valley, Rona Siegert, Connie Smock, Cody Nieko, Chris Johnson, Rebecca Ballard, Christina Jackson, Rex Underwood, Chandra King, Johnny Wu, Stacey Scrobe, and Crystal Wilcox.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction and venue over the subject matter of this complaint under 42 U.S.C. § 1983; 28 U.S.C. § 1331 and § 1343(a)(3); 28 U.S.C. § 2201 and § 2202; 28 U.S.C.§ 2283 and § 2284.

2.    Section 1983 authorizes civil actions for the "deprivation of any rights ... secured by the Constitution and laws" against a party acting under color of state law. 42 U.S.C. § 1983

## PARTIES

3.    Plaintiff Robert Templin ("Bobby") has been in the legal care and custody of the Idaho Department of Correction ("IDOC") since 2022. Bobby has been released from custody since the filing of the original Complaint.

4.    Josh Tewalt is the former IDOC Director. IDOC is the Idaho state agency

responsible for the incarceration of inmates and operates the Idaho State Correctional Center ("ISCC") and IMSI. As director, he wasresponsible for IDOC operations, including the policies, procedures, and practices followed by IDOC, its contractors, and its agents. Tewalt is also the final reviewer of medical decisions by IDOC's Management and Treatment Committee. He is sued in his personal capacity for damages.

5.      Defendant MHM Services dba Centurion Health is a corporation headquartered in Virginia. It contracts with IDOC to provide medical care and treatment to its residents. Centurion Health fulfils a traditional state function of providing medical care and treatment for prison residents.

6.      Defendant Centurion of Idaho, LLC is a limited liability company organized under the laws of Idaho and contracts with IDOC to provide medical care and treatment to all IDOC residents. It fulfils a traditional state function of providing medical care and treatment for prison residents. Both Centurion of Idaho, LLC and Centurion Health, Inc. are referred to as "Centurion."

7.      Tim Richardson ("Defendant Richardson") is the IMSI Warden. He is responsible for the care and medical treatment of all IMSI residents. He is the appellate authority for grievances. He has supervisory authority over IDOC and Centurion employees. He is sued in his personal capacity for damages.

8.      Randy Valley ("Defendant Valley") is the ISCC Warden. He is responsible for the care and medical treatment of all ISCC residents. He is the appellate authority for grievances. He has supervisory authority over IDOC and Centurion employees. He is sued in his personal capacity for damages.

9.     Rona Siegert, RN ("Defendant Siegert") is IDOC's Health Services Director. She monitors and oversees all aspects of healthcare services. Her duties include ensuring the contract medical provider complies with all applicable laws, rules, and regulations. She is the appellate authority for any grievance that involves complaints about medical providers and care. She is sued in her individual capacity for damages.

10.    Connie Smock, RN ("Defendant Smock") is employed by IDOC or Centurion as a Nurse Manager. She is sued in her individual capacity.

11.    Lieutenant Cody Nieko ("Defendant Lt. Nieko") is employed by IDOC as a correctional officer. He is sued in his individual capacity.

12.    Chris Johnson ("Defendant Johnson") is employed by Centurion as a health services administrator. He is sued in his individual capacity. He responded to many of Bobby's Resident Concern Forms. As a health services administrator, Johnson was responsible for overseeing the delivery of medical services at IDOC, and for establishing formal relationships with community hospitals, specialists, ground/emergency transport services, and others as needed.

13.    Rebecca Ballard, MD ("Defendant Ballard") is a medical doctor employed by Centurion to provide medical treatment to IDOC residents. She is sued in her individual capacity for damages.

14.    Christina Jackson, RN ("Defendant Jackson") is employed by Centurion to provide medical services to IDOC residents. She is sued in his individual capacity.

15.    Rex Underwood, NP ("Defendant Underwood") is employed by Centurion to provide medical services to IDOC residents. He is sued in his individual capacity.

16.    Chandra King, FNCP ("Defendant King") is employed by Centurion to provide

medical services to IDOC residents. She is sued in her individual capacity.

17.     Johnny Wu, MD ("Defendant Wu") is a doctor employed by Centurion to provide medical services to IDOC residents. He is sued in his individual capacity.

18.     Stacey Scrobe, RN ("Defendant Scrobe") is a nurse at Centurion Health. She is sued in her personal capacity.

19.     Crystal Wilcox, RN ("Defendant Wilcox") is a nurse at Centurion Health. She is sued in her personal capacity.

20.     IDOC Does 1 -5 are Idaho Department of Correction employees, whose identities are currently unknown to Plaintiff, who are responsible for off-site scheduling of medical appointments for residents within the IDOC. They are sued in their individual capacities for unreasonable scheduling delays.

21.     Centurion John and Jane Does 1 – 5 are Centurion local, regional, or national administrative employees whose identities are presently unknown to Plaintiff. These Does have decision-making authority to approve or deny care requested by an on-site medical provider. As such they are responsible for Mr. Templin's medical care. They are sued in their individual capacities for damages and official capacities for injunctive relief.

22.     At all times relevant hereto, Defendants were acting under the color of state law.

## FACTS

23.     On January 29, 2023, while at ISCC, Bobby's thumb was broken during a "large scale altercation." Upon information and belief, Warden Valley and Warden Richardson knew about this altercation, who was involved, and the injuries that resulted.

24.     Bobby first received imaging (an x-ray) for his hand on January 31, 2023 at IDOC. That imaging showed a "comminuted, displaced, intra-articular fracture of the thumb metacarpal

base." The distal portion of the fracture was laterally displaced by 3.5 mm. Thumb fractures with a displacement greater than 3 mm generally need to be repaired using an open reduction and internal fixation, meaning using surgery to place hardware to fix the bones in place while they heal. The fracture extended into the articular surface and had a step-off of less than 2 mm. He was not referred to emergency care or to a specialist.

25.    Soon after his thumb was broken, and because of the "altercation," Bobbywas moved to IMSI, where he was housed until his release.

26.    While seeking medical treatment, Bobby sent Health Services Requests ("HSRs"), Resident Concern Forms, and filed grievances, and appeals, or otherwise interacted with the following IDOC and Centurion employees: Tim Richardson; Randy Valley; Rona Siegert, RN; Connie Smock, RN; Lt. Cody Niecko; Sgt. Brian Crowl; Chris Johnson; Rebecca Ballard, MD; Christina Jackson, RN; Rex Underwood, NP; Stacey Scrobe, RN; Crystal Wilcox, RN; Chandra King, RN; Johnny Wu, MD; Doe Centurion Employees and IDOC Employees. The foregoing individuals were all involved in making medical decisions for Bobby and had the responsibility and ability to ensure that Bobby could access timely medical treatment pursuant to IDOC and Centurion's contract, policies, and procedures.

27.    Centurion, as the contract medical provider, and its employees, are responsible for implementing and practicing all of IDOC's Standard Operating Procedures and the National Commission on Correctional Health Care ("NCCHC") standards.

28.    Pursuant to the Centurion of Idaho Provider Manual, **All Centurion on-site practitioners are responsible for requesting specialty care.** Every single Defendant had the responsibility and the ability to request a visit for Bobby to see specialist. *See* First Amended Complaint, Exhibit A.

29.     Pursuant to the Centurion of Idaho Provider Manual, **All Centurion on-site practitioners are responsible for requesting emergency care.** Every single Defendant had the responsibility and the ability to request emergency care for Bobby. *See* First Amended Complaint, Exhibit A.

30.     Pursuant to the Centurion of Idaho Provider Manual, Centurion and IDOC have internal timeliness standards for when specialists must be seen after a referral is placed. *See* First Amended Complaint, Exhibit A. Upon information and belief, Bobby's visit to a specialist was outside those timeliness standards.

31.     Upon information and belief, Defendant Smock, as Director of Nursing, is supposed to serve as a resource on policies and procedures, ensure that Centurion is in compliance with its contract to provide health care services to IDOC, supervise and train IDOC and Centurion staff on policies and procedures regarding resident health services, and monitor operations. She is responsible for planning, coordinating, directing, and supervising the clinical program providing services to patients. Her deliberate failure to act was a ratification of Bobby's lack of appropriate medical attention.

32.     Warden Valley and Warden Richardson are responsible in ensuring that Centurion is following its Standard Operating Procedures and adopted standards from the NCCHC.

33.     Centurion and its employees are responsible for scheduling appointments for the offender to meet with the appropriate medical practitioner in a timely manner in accordance with its own policies.

34.     Centurion's Health Administrators are responsible for ensuring that sufficient medical staff is hired, present, and fulfilling their duties to Centurion's IDOC patients. They are also responsible for training staff. They have the ability to develop medical policy and ensure

implementation in accordance with their policies and procedures.

35.     Centurion's Health Administrators failed to devise or enforce policies and procedures that would ensure Bobby's adequate medical care and support. They failed to ensure that Bobby was timely scheduled with a provider who could properly assess and treat his hand injury. They failed to ensure that he could access physical therapy. They failed to ensure that prescribed Celebrex is available. These failures are in despite of the fact that it was routine treatment within the standard of care for the community for this injury.

36.     The Centurion medical providers at ISMI who were responsible for Bobby's care failed to schedule an appointment with a specialist, or follow up to ensure that an appointment was scheduled. This failure to timely see a specialist caused a permanent deformity of his hand.

37.     IDOC employees failed to expeditiously schedule an appointment with a specialist, or follow up expeditiously to ensure that a follow-up appointment was scheduled. This failure to timely see a specialist caused a permanent deformity of his hand.

38.     Bobby sent Resident Concern Forms, HSRs, filed Grievances and Appeals on a continual basis to Defendants regarding IDOC and Centurion's failures to address his medical condition and lack of treatment and follow their own policies and procedures

**Medical History**

39.     On January 31, 2023, Rebecca Ballard, MD evaluated Bobby. She confirmed the x-ray showed a displaced thumb fracture. Her plan notes state "[i]mmobilize and refer to hand surgery/ortho asap." Dr. Ballard did immobilize Bobby's hand. Upon information and belief, she did not place any referrals for Bobby to see a specialist.

40.     Dr. Ballard also had the ability and the authority to send Bobby to the emergency department for immediate medical treatment as the x-ray showed Bobby had a displaced fracture.

She did not. Dr. Ballard did not follow up with anyone to ensure that Bobby was actually seen by an orthopedic specialist or that an appointment with a specialist was actually scheduled.

41.    On February 3, 2023, Nurse Wilcox evaluated Bobby's health service request, recording that he "has urgent consult for ortho due to thumb fracture." Nurse Wilcox did not follow up with anyone to ensure that Bobby was actually seen by an orthopedic specialist or that it was actually scheduled. Nurse Wilcox, despite acknowledging that Bobby's broken thumb was urgent, and despite it being within her responsibilities and abilities, did not have him transported to an emergency department. Upon information and belief, she did not schedule an appointment with a specialist.

42.    On February 9, 2023, Bobby saw Rex Underwood, ARNP, who reviewed Bobby's x-ray showing the displaced fracture, noted that Bobby was in a splint, and that a hand specialist consult was placed. Underwood did not place a referral for a specialist, he did not follow up to ensure Bobby saw a specialist in a timely manner, nor did he have him transported to an emergency department for his displaced fracture, despite having the authority to do so pursuant to Centurion's Provider Manual.

43.    Defendant Wilcox saw Bobby again on February 10, 2023, she documented that his fingers and hand were cold to the touch and Bobby reported numbness in his fingers. She wrapped his hand with ace wrap Coldness and numbness can indicate severe problems with circulation or nerve damage. She failed to have Bobby transported to an emergency department or referred to a specialist, even though these were new and potentially serious symptoms.

44.    On February 11, 2023, Bobby sent a Resident Concern Form to Medical stating, "I've been in the hole now 14 days with a broken hand. My hand is only getting worse without the medical care I need." Health Services Administrator Defendant Johnson told Bobby "we are

FIRST AMENDED COMPLAINT - 9

working to get you scheduled with a specialist."

45.    On February 11, 2023, Bobby also sent a Resident Concern Form to Defendant Valley stating, "14 days ago my hand was broken so severely that medical here at ICC can't fix it. A medical told me I have to go to a hospital or surgeon for medical care. Two weeks and I still haven't been transported to get the medical attention I need." Defendant Valley, contrary to IDOC and Centurion's policies and procedures, failed to take any action.

46.    On February 11, 2023, Samantha Wood, Bobby's friend emailed Defendants Smock, Siegert, and Tewalt and the general ISCC email address to explain that Bobby was 13 days without any appropriate medical treatment. Contrary to IDOC and Centurion's policies and procedures, Defendants Smock, Siegert, and Tewalt failed to take any action in response to Ms. Wood's notice.

47.    Bobby's father contacted Defendants Valley and Smock several times to ask for help for Bobby's hand. Defendant Smock was the director of nursing and her responsibility was to monitor the healthcare contract and compliance. Defendants Valley and Smock, contrary to IDOC and Centurion's policies and procedures, failed to take any action after receiving notices from Bobby's father. On February 20, 2023, upon information and belief, Defendant Jackson told Bobby that they were trying to get him into surgery for his hand. She evaluated him in his cell, where Bobby reported numbness and a decreased range of motion in his index finger. Defendant Jackson told Bobby to leave his splint on and elevate the hand. She did not order a specialist consult, or follow up to ensure he was being seen by a specialist. She did not request transportation to the emergency department, despite having the authority to do so, at these new symptoms of reduced range of motion.

48.    St. Luke's appeared to have received a referral for Bobby to see an orthopedic

specialist on February 3, 2023, the next entry in the St. Luke's file was May 19, 2023. There does not appear to be any contact between IDOC, Centurion, and St. Luke's between February 3 and May 19, 2023.

49.     On February 24, 2023, a mental health counselor evaluated Bobby for a progress note and found, "PT appears to be experiencing increased mental health symptoms congruent to anxiety due to his physical health."

50.     On February 25, 2023, Bobby sent a Resident Concern Form to the Medical Director of Nursing Defendant Siegert stating "my hand has been broken now for 30 days. This is caused serious difficulty in daily living. Also, I am in constant fear that if not repaired now I will lose mobility in my hand, seriously affecting hand function. The repair of my hand is medically necessary. I am in chronic pain and anxiety due to my hand injury."

51.     Health Services Administrator Defendant Johnson told Bobby, seemingly unconcerned, "We have now been able to find you a provider to see you for your hand." Defendant Johnson did not follow up with a specialist or do anything to expedite Bobby seeing a specialist. As the Health Services Administrator, Defendant Johnson was responsible for overseeing the delivery of medical services at IDOC, and for establishing formal relationships with community hospitals, specialists, ground/emergency transport services, and others as needed.

52.     On February 27, 2023, Bobby was told that an offsite appointment had been scheduled.

53.     On March 1, 2023, Defendant Wu examined Bobby's hand and recognized that Bobby should have had surgery. Defendant Wu did not send a referral to a specialist, did not contact a specialist to expedite Bobby's appointment, did not confirm if the specialist appointment  was actually scheduled or follow up to ensure the appointment happened, despite having the authority

FIRST AMENDED COMPLAINT - 11

to do so.

54.     On March 5, 2023, Bobby sent a HSR to Defendant Smock asking for help with his hand and to "please help." Defendant Smock responded that if Bobby wants an update, to send an HSR to Nurse Practitioner Rogers instead. Defendant Smock had supervisory authority and it was her responsibility to ensure that procedures and policies were being followed, including that Centurion employees were appropriately handling referrals to specialists and emergency departments. Defendant Smock did not ensure that any of the other Defendants were appropriately handling Bobby's injuries. Defendant Smock had notice that Bobby was injured and was not getting appropriate medical treatment. Defendant Smock's failure to act, contrary to IDOC and Centurion policies and procedures, ratified Bobby's failure to receive medical treatment.

55.     On March 7, 2023, Health Services Administrator Defendant Johnson again told Bobby he was scheduled with an orthopedist. Bobby eventually filed a Grievance and Defendant Johnson reviewed and responded to the Grievance.

56.     Bobby's criminal defense attorney emailed Defendants Tewalt, Smock, and Seigert on March 8, 2023 to demand that Bobby be seen immediately by an orthopedic surgeon to avoid permanent disability and disfigurement. Defendants Tewalt, Smock, and Seigert again had notice that Bobby was not getting appropriate medical treatment for his hand, contrary to IDOC and Centurion's policies and procedures. Upon information and belief, Defendants Tewalt, Smock, and Seigert did not take any action regarding Bobby's injury, ratifying the delay and denial of appropriate medical treatment.

57.     By March 14, 2023, the medical record reflects that Bobby had sent in at least 14 "HSRs relating to his hand.

58.     On March 30, 2023, Bobby asked via a Resident Concern Form why he was not

receiving replies to his grievances, as the time had expired for a response, he was told that "medical is slowly working through grievances." IDOC has a policy regarding the time limit to respond to grievances, which was not being followed.

59.    On April 6, 2023, upon information and belief, Nurse Practitioner Rogers evaluated Bobby's hand for swelling and remarked that Bobby "fell through the cracks somewhere" regarding the long wait for medical treatment.

60.    On May 10, 2023, Nurse King examined Bobby's hand. She recorded "patient has limited mobility of his right thumb, unable to close and grasp my finger in hand. Unable to bring thumb to any of the other digits. The palm under the 1st digit is swollen without pitting or erythema. Unable to extend his first digit out. He is able to flex and extend digits 2-5 with some coaxing. PROM of digits 2-5 WNL" Despite her observations, she did not escalate his need for seeing an orthopedic specialist. She told him to keep his hand elevated. She did not do anything to ensure he could see a specialist or follow up to ensure an appointment was scheduled. She did not address her findings with a supervisor, even though Bobby's hand showed increasing swelling and decreased grasp.

61.    Due to Defendants' failure to follow their own policies and procedures, short staffing, failure to train, failure to supervise, failure to follow all standards for emergency treatment, or other incompetencies, Bobby suffered delays in the grievance process and getting appropriate medical treatment.

62.    Defendants purposefully, intentionally and recklessly have a history, custom, policy, and practice of denying, delaying, ignoring, and improperly responding to inmate medical requests and not taking proper and timely actions to prevent needless pain and injuries caused by serious medical condition.

FIRST AMENDED COMPLAINT - 13

**Orthopedic Specialist**

63.     Ultimately, Bobby did not have a CT scan until June 30, 2023, and was not seen by an orthopedic specialist until July 25, 2023, seven months after this thumb was broken. At that point, the bone had healed in a deformity and could no longer be repaired absent additional invasive procedures, such as thumb fusion surgery.

64.     Dr. Judd, a board certified orthopedic hand specialist at St. Luke's, diagnosed Bobby with a right thumb metacarpal intra-articular base fracture, also known as a Bennett fracture, which had "healed with a deformity." Bennett fractures are generally surgical and can require hardware to encourage proper healing.

65.     When a Bennett fracture does not heal properly, it causes deformity of the thumb with loss of range of motion and loss of grip strength. Now, Bobby has a significant decrease in strength, ability, and range of motion in his right hand compared to his left.

66.     On December 12, 2023, upon information and belief, Dr. Judd discouraged surgery to fix Bobby's thumb because of IDOC and Centurion's failure to ensure patients attend post-operative appointments.

67.     Surgery to repair the deformity is not guaranteed to restore Bobby's range of motion and grip strength or decrease or stop the pain and swelling. The injury has caused a marked decrease in Bobby's grip strength in his right hand. He has lost significant range of motion in his hand and wrist. Bobby's right hand and wrist are continuously swollen and painful.

68.     Dr. Judd prescribed Celebrex for Bobby's hand. There was a significant delay in Bobby starting the medication.

**Front Cuff Order**

69.     Both Dr. Orm (a Centurion doctor) and Dr. Judd provided Bobby with a front cuff

order to mitigate the pain and swelling in his hand and wrist. Defendants Lt. Neicko and Scrobe discontinued Bobby's front cuff memo March 7, 2024, contradicting the orders of two medical doctors.

70.     Instead of a front cuff, IDOC employees could alternately use two sets of handcuffs, or "double cuff" Bobby, which Defendants failed to do.

71.     Using cuffs behind Bobby's back caused unnecessary pain, swelling and discomfort in Bobby's hand. Bobby's thumb/wrist healed in a way that prevents him from bending his hand and wrist normally and he has a greatly decreased range of motion. Using front cuffs or double-cuffing Bobby would have allowed Bobby's hand to be at a more natural angle, decreasing swelling, pain, and discomfort.

**Bobby's Current Status**

72.     Bobby continued to send HSRs, Resident Concern Forms, and Grievances in an attempt to obtain physical therapy or other medical treatment that could alleviate the pain and swelling he suffers in his right hand. However, the damage has largely been done as his thumb has healed with a deformity.

73.     Now, because of the injury to his right hand, Bobby needs future medical treatment, has suffered permanent impairment and deformity, has lost access to the labor market, and has lost access to future wages. He has also suffered non-economic damages, including incredible anxiety from having a permanent disability, and pain and suffering.

74.     Prior to incarceration, Bobby worked in construction. Due to the deformity on his dominant hand, his ability to work in construction has diminished. He has decreased range of motion, decreased grip strength, and decreased ability to hold items. This has caused Bobby a loss in access to the labor market upon his release and future lost earnings.

75.     Bobby had to obtain the services of an attorney for this case and hired Jane Gordon Law.

## CLAIMS FOR RELIEF
### Eighth and Fourteenth Amendments 42 U.S.C. § 1983
### Cruel and Unusual Punishment – Delay and Denial of Medical Care

76.     Defendants were acting under the color of state law.

77.     Bobby's broken thumb was -- and continues to be -- a serious medical need.

78.     Each and every Defendant was deliberately indifferent to Bobby's broken thumb and the resulting pain.

79.     Each and every Defendant knew of his serious medical condition and disregarded it by failing to take any reasonable measures to address it.

80.     Each and every Defendant ignored IDOC and Centurion policies, practices, and procedures regarding inmate medical treatment.

81.     Defendants Valley and Richardson were responsible for ensuring IDOC and Centurion employees were trained in IDOC and Centurion policies and practices and that IDOC and Centurion employees followed IDOC and Centurion policies and practices. They failed to ensure their employees followed IDOC and Centurion policies and practices

82.     Upon information and belief, Defendants Valley and Richardson had notice of Bobby's injury and failure to receive medical attention as they knew about the underlying "altercation" (and the injuries sustained therein) that caused Bobby's transfer from ISMI from ISCC. Pursuant to IDOC policy and procedures they were informed of the "large scale group disruption," injuries sustained, and inmate transfers between facilities.

83.     Upon information and belief and pursuant to IDOC policy and procedures, Defendants Valley and Richardson are both appellate authorities for the grievance process.

Bobby filled out at least eight Grievances and Appeals, mostly to IMSI and one to ISCC. Defendant Valley was specifically addressed in a grievance and in a minimum of two emails regarding Bobby's situation. Against IDOC policy and procedure, neither Defendant Valley nor Defendant Richardson took any action, r ratifying the denial and delay of Bobby's medical treatment.

84.    Defendants Siegert and Smock both had the duty to supervise, train, and ensure the medical staff was providing appropriate medical care in accordance with the IDOC and Centurion policies and procedures. When informed about Bobby's lack of appropriate medical treatment, neither Siegert or Smock took any action, ratifying the denial and delay of Bobby's medical treatment.

85.    On January 31, 2023, when Bobby was initially evaluated and x-rayed by IDOC/Centurion medical staff and imaging showed that his thumb fracture had a 3.5 mm displacement, Bobby should have been taken to emergency medical treatment. Even Dr. Ballard said the matter was urgent.

86.    The weeks following his x-ray presented many opportunities for Defendants to take Bobby to seek emergency medical treatment to save his hand. Instead, they waited until his fracture was healed in a deformity before taking him to see a specialist.

87.    Defendants failed to ensure that Bobby was actually going to a specialist for medical treatment. Defendants failed to ensure that an appointment with a specialist was actually scheduled. Defendants failed to  have Bobby seen by a specialist. Defendants failed to get Bobby emergency treatment, even though it was well within their authority, pursuant to IDOC and Centurion's policies and procedures.

88.     Defendants further contributed to Bobby's injury by refusing to use front handcuffs or use double handcuffs while his hands are behind his back, despite an order from a medical doctor to do so. This exacerbates the swelling and pain in his hand due to the angle that the handcuffs force his wrists into.

89.     Bobby should not have had to wait seven months to see an orthopedic specialist. It was deliberate indifference to not seek immediate medical attention and to continuously and intentionally and recklessly delay and fail to schedule an appointment with a hand specialist and fail to respond to request for necessary treatment to alleviate Bobby's pain and suffering and ongoing injury.

90.     Defendants purposefully, intentionally and recklessly have a history, custom, policy, and practice of denying, delaying, ignoring, and improperly responding to inmate medical requests and not taking proper and timely actions to prevent needless pain and injuries caused by a serious medical condition.

91.     Defendants did not properly supervise the medical staff and treatment that was requested and not provided to Bobby and thereby encouraged, condoned and ratified the denial of necessary medical treatment of serious medical conditions and the infliction of needless pain and injuries upon Plaintiff.

92.     Plaintiff was forced to experience pain and suffered emotional distress, mental anguish, physical disability, disfigurement and permanent impairments due to Defendants' failure to timely respond, examine, and treat Plaintiff's serious, medical condition and the failure to reasonably and promptly transfer Plaintiff to a hospital.

93.     This deliberate indifference caused severe harm to Bobby.

## PRAYER FOR RELIEF

1.    WHEREFORE, Plaintiff Robert Templin respectfully prays this Court enter

judgment granting him the following:

2.    A declaration that the acts and omissions set forth herein violated Plaintiff's rights

under the Constitution and the laws of the United States.

3.    Injunctive relief ordering Defendants or their successors to provide Plaintiff with

effective treatment for his serious medical condition.

4.    Compensatory damages against each Defendant in the amount to be determined at

trial, jointly and severally, against each Defendant for serious pain, suffering,

unnecessary physically injury, disability, deformity, mental anguish, loss of

access to the labor market and future lost wages.

5.    Punitive damage against each Defendant in the amount to be determined at trial.

6.    A jury on all triable issues.

7.    Attorney's fees, costs, and expenses under 42 USC § 1988 and all relevant

statutes and rules.

8.    Any additional relief this Court deems just, proper, and equitable.

DATED November 10, 2025.

JANE GORDON LAW

*/s/ Jane Gordon*
Jane Gordon, of the firm
Attorney for Plaintiff



# Centurion of Idaho, LLC

# Provider Manual

COMPLAINT EXHIBIT A

January 2024



**Provider Manual**

## Table of Contents

CENTURION OF IDAHO Overview ............................................................................................................5

CENTURION OF IDAHO Guiding Principles .............................................................................................5

CENTURION OF IDAHO Approach ..........................................................................................................5

CENTURION OF IDAHO Summary ..........................................................................................................6

Working with CENTURION OF IDAHO ....................................................................................................6

    CENTURION OF IDAHO Regional Office Key Utilization Management Staff ...................................7

    IDAHO DOC Facility Names and Contact Numbers .........................................................................7

CENTURION OF IDAHO On-Site Services ................................................................................................7

    On-Site Practitioners .......................................................................................................................8

    On-Site Practitioner Availability ......................................................................................................9

    24-Hour Access ...............................................................................................................................9

Monitoring Healthcare Services.............................................................................................................9

Specialty Care, Emergency Department and Hospitalization Accessibility/Coordination.........................10

Specialty Care Prior Authorization ......................................................................................................10

Emergency Department Services ..........................................................................................................10

Hospitalization .....................................................................................................................................11

Specialty Provider Responsibilities ......................................................................................................11

Working with the Residents..................................................................................................................11

Continuity of Care ................................................................................................................................12

Specialist Appointment Access Standards ............................................................................................12

Hospital Responsibilities ......................................................................................................................13



**Provider Manual**

Provider Assistance with Public Health Services ................................................................................ 13

Credentialing Requirements ............................................................................................................... 13

Provider/Facility Site Review ............................................................................................................. 14

Eligibility ............................................................................................................................................. 14

Billing and Claims ............................................................................................................................... 15

General Billing Guidelines ............................................................................................................. 15

Billing the Resident ....................................................................................................................... 16

Clean Claim Definition ................................................................................................................... 16

Non-Clean Claim Definition ........................................................................................................... 16

Timely Filing .................................................................................................................................. 16

Electronic Claims Submission ........................................................................................................ 17

Paper Claims Submission ............................................................................................................... 17

Provider Portal ............................................................................................................................... 18

Unsatisfactory or Claim Payment Concerns .................................................................................. 18

Provider Relations Assistance ............................................................................................................ 18

Provider Updates ........................................................................................................................... 18

Provider Complaints ...................................................................................................................... 19

CENTURION OF IDAHO Pharmacy Program ...................................................................................... 19

Pharmacy and Therapeutics (P&T) Committee ............................................................................. 19

Medical Records ................................................................................................................................. 20

Overview ........................................................................................................................................ 20

Release of Medical Records ........................................................................................................... 20



**Provider Manual**

Medical Records Audits ........................................................................................................ 20

CENTURION OF IDAHO Utilization Management Department ........................................... 21

Overview and Medical Necessity ........................................................................................ 21

Prior Authorization Overview ............................................................................................. 22

On-Site Practitioner Referral for Specialty Service ............................................................ 22

Specialist Referral to Specialist for Treatment or Second Opinion .................................... 23

Process to Request Follow-Up Specialty Services ............................................................... 23

Self-Directed Care .............................................................................................................. 23

Prior Authorization Response TImeline............................................................................... 23

Medical Necessity .............................................................................................................. 24

Review Criteria ................................................................................................................... 24

Requirements for Providers to Notify CENTURION OF IDAHO Utilization Management Department ...... 25

Emergency Services ........................................................................................................... 25

Notification of Observation Stays ...................................................................................... 25

Concurrent Review ............................................................................................................. 26

Discharge Planning ............................................................................................................ 26

Retrospective Review ......................................................................................................... 27

Summary ............................................................................................................................. 27



**Provider Manual**

## CENTURION OF IDAHO Overview

Welcome to the CENTURION OF IDAHO, LLC Provider Manual.

CENTURION OF IDAHO has entered into an agreement with Idaho Department of Correction ("IDOC") to provide comprehensive healthcare services to residents throughout the state's correctional system. CENTURION OF IDAHO is committed to building collaborative partnerships with Providers.

CENTURION OF IDAHO serves the IDOC consistent with our core philosophy that quality correctional healthcare requires coordination of care provided within the correctional facility and the services provided "outside the walls." Headquartered in Boise, all CENTURION OF IDAHO employees that work within IDOC and Providers are based in Idaho.

## CENTURION OF IDAHO Guiding Principles

In your dealings with CENTURION OF IDAHO you will find that we apply the following guidelines to all of our interactions. We…

- Provide access to high quality, accessible, cost-effective healthcare
- Perform our functions with integrity, operating at the highest ethical standards
- Build mutual respect and trust in our working relationships
- Create communication that is open, consistent and two-way
- Embrace diversity of people, cultures, and ideas
- Encourage innovation to challenge the status quo
- Stress teamwork and meeting our commitments to one another

Also, please note that CENTURION OF IDAHO welcomes open Provider communication regarding appropriate treatment alternatives.  CENTURION OF IDAHO does not penalize Providers for discussing medically necessary, appropriate care or treatment options with our on-site primary care physicians.

## CENTURION OF IDAHO Approach

Recognizing that a strong healthcare program is predicated on building mutually satisfactory associations with Providers, CENTURION OF IDAHO is committed to:



**Provider Manual**

- Working as partners with participating Providers
- Performing our administrative and clinical responsibilities in a superior fashion

As much as possible, CENTURION OF IDAHO programs, policies and procedures are designed to minimize the administrative responsibilities in the management of care, enabling the Provider to focus on the healthcare needs of their patients.

## CENTURION OF IDAHO Summary

CENTURION OF IDAHO's philosophy is to provide access to high quality healthcare services by combining the expertise of on-site primary care practitioners and specialty providers/specialty services with a highly successful, experienced managed care administrator. CENTURION OF IDAHO believes that successful patient outcomes are the result of providing care that is medically necessary, rendered in the appropriate setting and at the appropriate interval.

It is the policy of CENTURION OF IDAHO to conduct its business affairs in accordance with the standards and rules of ethical business conduct and to abide by all applicable federal and Idaho laws.

CENTURION OF IDAHO takes the privacy and confidentiality of health information seriously. We have processes, policies and procedures to comply with the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and Idaho Privacy Law requirements.

## Working with CENTURION OF IDAHO

For your convenience, we have included a quick reference guide to provide an overview of your role in providing care and recommendations for care as part of your CENTURION OF IDAHO contract. The information below and throughout this manual will include information that should assist you and your day-to-day operations staff. The information includes:

- Contact information for CENTURION OF IDAHO Utilization Management Department
- Name and contact number for Department of Correction sites
- Claims submission and contact information
- Role of the CENTURION OF IDAHO on-site practitioner
- The referral process and your role
- Information required by CENTURION OF IDAHO on-site healthcare team for continuity and provision of care



**Provider Manual**

*CENTURION OF IDAHO Regional Office Key Utilization Management Staff*

| | |
|---|---|
| CENTURION OF IDAHO Utilization Management Department | (855) 202-1808,  option 1 |
| CENTURION OF IDAHO Statewide Medical Director | (855) 202-1808 |
| CENTURION OF IDAHO Statewide Director of Nursing | (855) 202-1808 |

*IDOC Facility Names and Contact Numbers*

| Site Name | City | Phone # |
|---|---|---|
| Idaho Correctional Institution-Orofino (ICIO) | Orofino | (208) 476-3655 |
| North Idaho Correctional Institution-Cottonwood (NICI) | Cottonwood | (208) 962-3276 |
| Idaho Maximum Security Institution (IMSI) | Kuna | (208) 338-1635 |
| Idaho State Correctional Institution (ISCI) | Kuna | (208) 336-0740 |
| South Idaho Correctional Institution (SICI) | Kuna | (208) 336-1260 |
| South Boise Women's Correctional Center (SBWCC) | Kuna | (208) 334-2731 |
| Pocatello Women's Correctional Center (PWCC) | Pocatello | (208) 236-6360 |
| Idaho State Correctional Center (ISCC) | Kuna | (208) 331-2760 |
| Saint Anthony Work Camp (SAWC) | Saint Anthony | (208) 624-3775 |
| Nampa Community Reentry Center (NCRC) | Nampa | (208) 465-8490 |
| Treasure Valley Community Reentry Center (TVCRC) | Boise | (208) 334-2241 |
| Idaho Falls Community Reentry Center (IFCR) | Idaho Falls | (208) 525-7143 |
| East Boise Community Reentry Center (EBCRC) | Boise | (208) 334-3448 |
| Twin Falls Community Reentry Center (TFCRC) | Twin Falls | (208) 644-7900 |
| Mountain View Transformation Center (MVTC) | Kuna | (208) 336-9959 |

# CENTURION OF IDAHO On-Site Services

Most on-site Healthcare Services Units operate 24 hours a day, 7 days a week.  The type of staff used to provide services besides practitioner staff include registered nurses, licensed practical nurses, certified nurse assistants, medical assistants, medical records clerks, and secretarial/administrative assistant staff.

The sites also provide on-site mental health and dental staff to allow a full complement of on-site care capabilities.  Sites are managed by a clinical and administrative team that may include a Medical



**Provider Manual**

Director, Director of Nursing, and/or Health Services Administrator.

Medication services include provision of all practitioner ordered medications. These are managed on-site and generally provided by single dose administration. There are medical infirmaries which are staffed with nursing staff 24 hours a day, 7 days a week to allow provision of higher level of medical care such as IV management, wound care, and pre/post op care.

The goal of health services within a correctional services contract is to perform as much care/service on-site to minimize the need to transport residents outside of the facility. We strive to provide appropriate level of care and services while minimizing the risk to public safety by transporting residents to outside service providers.

Healthcare services that are routinely provided by on-site services and/or mobile service providers include:

- CLIA waivered tests such as blood glucose monitoring, urine pregnancy tests, blood guaiac tests, etc. Sites also draw all routine labs. These labs are drawn, prepared, picked-up, and results completed/returned by a contracted lab vendor.
- Radiology services include routine chest, and extremity radiographs. Some sites may also have availability of services provided by a mobile vendor for ultrasound, mammography, etc.
- Dialysis services

## *On-Site Practitioners*

Practitioners providing care can include a combination of physicians, nurse practitioners and physician assistants. On-site practitioners are CENTURION OF IDAHO employees and serve as the primary care providers and medical home for the management of resident patient care.

Site practitioners are responsible for providing/performing care and management of urgent and routine medical care. They are also responsible for care and management of resident patients with chronic disease. Site practitioners are also responsible for requesting and managing resident patient specialty care. Resident patients are not allowed to 'self-refer' for a specialty provider/service as allowed in the community.

The on-site practitioners submit requests for specialty service based on the CENTURION OF IDAHO prior authorization list (PAL) for services identified as requiring medical necessity determination. CENTURION OF IDAHO uses InterQual and other evidence-based criteria to assess medical necessity of the request. Our program uses a two level review system where trained utilization management nurses perform Level 1 review. Any request not meeting criteria for Level 1 approval is deferred to our CENTURION OF IDAHO Statewide Regional Medical Director for final determination.



**Provider Manual**

### *On-Site Practitioner Availability*

Availability is defined as the extent to which CENTURION OF IDAHO employs the appropriate type and number of practitioners necessary to meet the needs of the resident patient population housed in the institution.  As part of our contract with IDOC, CENTURION OF IDAHO provides all the on-site practitioner staff.   Most on-site practitioner staff is provided Monday through Friday during the day; however, larger sites with more complex resident patients may include evening and/or weekend coverage.  Hours of practitioner time on-site can range from 4 hours/week for a very small site to 80 hours+/week for larger sites.

### *24-Hour Access*

Regardless of the assigned staffing at the site, CENTURION OF IDAHO provides access to on-call practitioner(s) 24 hours a day, 7 days a week.  Access to a provider can include a practitioner returning to the facility for such things as suturing.

## Monitoring Healthcare Services

CENTURION OF IDAHO monitors the quality of our healthcare services in numerous ways to include the following:

| *Department* | *Data Available* | *Description* | *Frequency of Monitoring* |
|---|---|---|---|
| Network & Contract Management | On-site Practitioner Availability<br><br>Specialty Provider and Specialty Service Availability | Ensures that CENTURION OF IDAHO employs the appropriate type and number of on-site practitioners and specialty care providers/services necessary for appropriate and timely access to care.<br>Analyzes a variety of reports to determine if additional Providers may be required | Ongoing |
| Utilization Management | Prior Auth & Concurrent Review | Ensures prior authorization and management of care based on evidence based practice guidelines | Daily |
| On-site Quality Improvement Monitoring | Complaints | Monitors provision of on-site and off-site access to care; tracks and trends resident complaints and grievances. | Ongoing<br><br>Analyzed Quarterly |



**Provider Manual**

| Quality Improvement Committee (QIC) | Audits Process and Outcome Studies | Summary information is reported for review and recommendation at the QIC and is incorporated into CENTURION OF IDAHO's annual assessment of quality improvement | Meetings at least Quarterly |
|---|---|---|---|

# Specialty Care, Emergency Department and Hospitalization Accessibility/Coordination

As part of our health services contract, CENTURION OF IDAHO has a Utilization Management Department.  The department includes utilization management staff performing prior authorization, concurrent review, retrospective reviews, appeals management, and other utilization review activities.

## Specialty Care Prior Authorization

On-site practitioners are responsible for requesting any services requiring prior authorization. Therefore, prior to the resident being scheduled for an appointment, the service requested, such as 'initial evaluation and treatment recommendations' will have been authorized.  Upon return from a specialist visit, the on-site practitioner will review the evaluation and recommendations from the specialist.  Based on the recommendations, the on-site practitioner may submit a new request for additional services that were recommended as part of the initial specialty consultation.  You, as the specialist, are not responsible for requesting the prior authorization.

## Emergency Department Services

Emergency department visits do not require prior authorization.  If a resident patient is sent to your emergency department for services, the on-site nursing staff will notify you that the resident is in route to your facility and provide a report regarding the patient's current care/status.   Residents presenting to the emergency room will be transported by one or two correctional officers who will stay with the resident throughout the course of the emergency department visit.

Our on-site nursing supervisor will routinely make contact with the emergency department requesting updates for prolonged visits.  If it is determined the resident will require hospitalization, it is important to contact the referring site's healthcare nursing supervisor.  If the resident requires transfer to another institution, you will need to work in conjunction with the correctional officers and site healthcare staff regarding the transfer.  Residents requiring transfer to an inpatient bed or inpatient facility will be followed by CENTURION OF IDAHO utilization management staff.



**Provider Manual**

## Hospitalization

Pre-planned hospitalizations require prior authorization.  The prior authorization process is initially managed by the on-site practitioner.  Upon admission to the hospital, CENTURION OF IDAHO utilization management staff should be notified.  While the on-site nursing staff provides notification to the CENTURION OF IDAHO utilization management staff, we also request that the utilization review staff at the inpatient facility provide notification regarding the resident patient admission to the facility.

Management of concurrent review of hospitalized resident patients is coordinated by the CENTURION OF IDAHO utilization management staff.  Our staff coordinates review with hospital utilization staff and provides necessary updates for the on-site practitioner and nursing staff.  CENTURION OF IDAHO utilization management staff also assists with coordinating discussions related to discharge planning. The goal of discharge planning is to discharge the resident back to the facility as soon as medically indicated; remembering that discharge planning may include release back to one of the correctional facilities that has infirmary capabilities.

## Specialty Provider Responsibilities

Specialty services are obtained within the CENTURION OF IDAHO network upon approval of the prior authorization request initiated by the on-site practitioner.  Specialists may complete diagnostic tests if part of the authorized service.  It is important to remember that when coordinating scheduling, the on-site staff should be informed of results of testing and patient history that may be required as part of the specialty visit.  These documents, test results, radiology exams, etc. will be sent with the resident for your review.

If an immediate need arises during the visit to your office and you feel additional services, evaluation or testing may be required immediately; you will be required to contact the CENTURION OF IDAHO Utilization Management Department to request prior authorization for those services.  This would include such requests as, referral to another specialist or admission to the hospital.  Prior authorization is not required in a true emergency situation. However, all non-emergency inpatient admissions require prior authorization from CENTURION OF IDAHO.

**Please call the Utilization Management team at (855) 202-1808, option 1 for prior authorization before performing any tests or procedures that are not part of the original authorization for this visit.**

## Working with the Residents

The resident patient will be accompanied by one or two correctional officers whenever he/she comes for an appointment.  The officers transporting will work closely with you and your office staff to provide privacy for your other patients.  CENTURION OF IDAHO and IDOC will work with you to minimize any disruption to your other patients.



**Provider Manual**

The transporting correctional officer will provide you and your staff with a sealed envelope that includes the resident patient's confidential medical record. The packet may also include a document on which you can briefly document the synopsis of the encounter/visit. If a document is not included, simply document the note on a standard progress note from your office and include a copy with the returning records. All medical record information should be placed back in the envelope, re-sealed and provided to the transporting correctional officers prior to leaving your office.

When working with the resident patient, it is important that you do not share any information with him/her specific to follow-up recommendations and particularly follow-up appointment dates, if already and/or previously scheduled. If at any point you realize that you have informed the resident patient of an upcoming appointment date and/or time, it is important that you notify the healthcare unit immediately to permit the appointment to be rescheduled.

## Continuity of Care

Since CENTURION OF IDAHO on-site practitioners are responsible for continuity of care, it is extremely important that they obtain timely and thorough documentation from you, as the specialist, related to your evaluation and treatment recommendations for the resident patient. Therefore, important responsibilities of you as the specialist include:

- Coordinate the resident patient's care with the on-site practitioner
- Complete written evaluation/report and return as part of the resident patient's visit
- Provide the on-site practitioner with complete consult report and other appropriate records within 5 business days of seeing the resident patient

## Specialist Appointment Access Standards

Timely access to appointments for resident patients requiring evaluation and/or follow-up care is important to providing acceptable access to services as well as to maintaining positive outcomes. CENTURION OF IDAHO staff responsible for coordinating scheduling will work with your office scheduler or designee to identify a routine process for scheduling, including routine times/days of the weeks that may be coordinated or set aside for easier access to appointments.

Our contracts routinely require that specialty appointments be completed within a designated timeframe from the time of their prior approval by our utilization management staff. Our Utilization Management staff will work closely with you to access services within our specified time frames.

CENTURION OF IDAHO will monitor appointment timeliness and access to specialty services as part of our ongoing Quality Improvement Program. Issues specific to access and timeliness will be discussed with individual providers and/or services if required.



**Provider Manual**

## Hospital Responsibilities

CENTURION OF IDAHO utilizes a network of hospitals to provide services to residents.  Hospitals providing services as part of the CENTURION OF IDAHO network will work with Utilization Management staff for the following:

- Obtain authorization for inpatient services and non-emergent outpatient services except for emergency stabilization services
- Notify CENTURION OF IDAHO Utilization Management Department of all maternity admissions upon admission and all other admissions by close of the following business day
- Notify CENTURION OF IDAHO Utilization Management Department of all newborn deliveries on the same day as the delivery.  Also, notify Idaho Medicaid when applicable.  Note: CENTURION OF IDAHO is not responsible for the payment of newborn services.
- Perform concurrent review and discharge planning in conjunction with CENTURION OF IDAHO utilization management staff
- Assist in determining most appropriate and lowest level of care to provide medically necessary care
- Assist in providing continuity of care from hospital facility back to the correctional institution.

CENTURION OF IDAHO network hospitals should refer to their contract for complete information regarding the hospital's obligations and reimbursement.

## Provider Assistance with Public Health Services

CENTURION OF IDAHO is required to coordinate with public health entities regarding the provision of public health services.  Providers must assist CENTURION OF IDAHO in these efforts by working with the CENTURION OF IDAHO Chief Nursing Officer or designee in:

- Complying with public health reporting requirements regarding communicable diseases and/or diseases which are preventable by immunization as defined by Idaho law
- Assisting in the notification or referral of any communicable disease outbreaks involving resident patients to the local public health entity as defined by Idaho law
- Assisting in the notification or referral to the local public health entity for tuberculosis contact investigation, evaluation, and the preventive treatment of persons with whom the resident patient has come into contact.
- Assisting in referring resident patients to the local public health entity for STD/HIV contact investigation, evaluation, and preventive treatment of persons whom the resident patient has come into contact.

## Credentialing Requirements

Physicians and applicable ancillary providers must complete the credentialing process to be a



**Provider Manual**

participating provider with CENTURION OF IDAHO.  CENTURION OF IDAHO recognizes the credentialing information supplied by CAQH if the provider is already registered.  A single-page demographic form is the only requirement for CAQH participating providers.

Credentialing materials can be found in the Provider section of the Centurion website at:
www.teamcenturion.com

## Provider/Facility Site Review

Site visits are performed on a case-by-case basis in cooperation with the provider, provider practice or inpatient facility.  Site visits will be performed by CENTURION OF IDAHO Utilization Management Department staff.  Site visits will be coordinated, as indicated, with the provider office management staff and/or inpatient utilization management staff prior to the visit.  CENTURION OF IDAHO Medical Management Department staff will work with designated provider/facility staff to define reason/purpose of the visit to allow for proper coordination and provision of information required, if indicated.

## Eligibility

Eligibility has a slightly different meaning in a correctional system.  Eligibility is tied directly to the resident being housed and/or 'on count' at an IDOC facility.  Therefore, residents are considered 'eligible' for authorized services from the date of incarceration to the date of release from the IDOC.  It is important to understand that there may be times when residents are released from facilities and then, may be re-arrested and returned to the IDOC system.  If this occurs, the resident is not eligible for CENTURION OF IDAHO payment of services during the time they are released from the facility until re-arrested.

It is important to ensure that your staff that manages scheduling understands that a resident will never contact them directly to schedule an appointment.  Appointment scheduling will always be completed for services being authorized/paid for by CENTURION OF IDAHO through a CENTURION OF IDAHO healthcare staff member.  Residents will be escorted by IDOC correctional officers for all appointments. If a person presents without an IDOC escort, the Provider must call the CENTURION OF IDAHO Medical Management Department to determine whether the person is still incarcerated.

CENTURION OF IDAHO is not financially responsible for services the person receives prior to or upon



**Provider Manual**

discharge from the IDOC. If you have questions, it is best to contact Medical Management regarding the resident's eligibility for services. CENTURION OF IDAHO is not responsible for the services provided to a newborn of an IDOC resident.

# Billing and Claims

## *General Billing Guidelines*

CENTURION OF IDAHO processes claims in accordance with applicable State prompt pay requirements. Physicians, other licensed health professionals, facilities, and ancillary Provider's contract directly with CENTURION OF IDAHO for payment of covered services.

It is important that Providers ensure CENTURION OF IDAHO has accurate billing information on file. Please confirm with your Provider Relations Department that the following information is current in our files:

- **Practitioner or Provider Name** (as noted on current W-9 form)
- **National Provider Identifier (NPI)**
- **Tax Identification Number (TIN)**
- **Taxonomy Code**
- **Physical location address** (as noted on current W-9 form)
- **Billing name and address** (if different)

Providers must bill with their NPI number in box 24Jb on the CMS1500 (HCFA) or box 56 on the CMS1450 (UB04). We encourage Providers to also bill their taxonomy code in box 24Ja and appropriate ID qualifier in 24I to avoid possible delays in processing. Claims missing the requirements will be returned and a notice sent to the Provider, creating payment delays. Such claims are not considered "clean," and therefore cannot be accepted into our system.

We recommend that Providers notify CENTURION OF IDAHO in advance, but no later than 30 days, of changes pertaining to billing information. Please submit this information on a W-9 form. Changes to a Provider's Tax Identification Number (TIN) and/or address cannot be processed when conveyed via a claim form. Such changes must be communicated as noted in the Provider Update section of this manual.

Claims eligible for payment must meet the following requirements:
- The resident was incarcerated on the date of service
- Referral and Prior Authorization processes were followed, if applicable

Paper claims must be submitted on standard CMS1500 (HCFA) and CMS1450 (UB04) red claim forms. Claims must be printed in Flint OCR Red, J6983 (or exact match) ink, and paper claim forms submitted must be typed or printed with either 10 or 12 Times New Roman font. Photo copies and faxes of claim



**Provider Manual**

forms that are handwritten will not be accepted for processing and will be returned and a notice sent to the Provider requesting submission.

Payment for service is contingent upon compliance with referral and prior authorization policies and procedures, as well as the billing guidelines outlined in this manual and the Provider Billing Guide.

**Please note that inpatient services may be covered directly by Idaho Medicaid for those persons deemed eligible.  Inpatient claims should be billed directly to Medicaid for reimbursement unless the Provider has been notified that the patient is ineligible.**

### Billing the Resident

Residents cannot be billed directly for any service or co-pay.

### Clean Claim Definition

A clean claim is defined as a claim received by CENTURION OF IDAHO for adjudication, in a nationally accepted format in compliance with standard coding guidelines and which requires no further information, adjustment, or alteration by the provider of services in order to be processed by CENTURION OF IDAHO.  The following exceptions apply to this definition: (a) a claim for which fraud is suspected; and (b) a claim for which a Third Party Resource should be responsible.

### Non-Clean Claim Definition

A non-clean claim is defined as a submitted claim that requires further investigation or development beyond the information contained in the claim.  The errors or omissions in the claim may result in: (a) a request for additional information from the Provider or other external sources to resolve or correct data omitted from the claim; (b) the need for review of additional medical records; or (c) the need for other information necessary to resolve discrepancies.  In addition, non-clean claims may involve issues regarding Medical Necessity and include claims not submitted with the filing deadlines.

### Timely Filing

Contracted Providers (in Network) must submit all original claims (first time claims) and encounters within 365 calendar days from the date of service.

Non-Contracted Providers (out of Network) must submit all original claims (first time claims) and encounters within 365 calendar days from the date of service.

**All corrected claims, requests for reconsideration, or claim disputes must be received within two years from the date of service.  Reference to the original claim number should be**



**Provider Manual**

included in field 22 of the CMS1500 and field 64 of the UB04 on the resubmitted claim form.

## *Electronic Claims Submission*

Emdeon Payer ID -    IHS11

Providers that bill electronically are responsible for filing claims within the same filing deadlines as Providers filing paper claims. Providers that bill electronically must monitor their error reports and evidence of payments to ensure all submitted claims and encounters appear on the reports. Providers are responsible for correcting any errors and resubmitting the affiliated claims.

## *Paper Claims Submission*

All paper claims and encounters should be submitted as follows:

Mailing address for Paper Claims:

Centurion of Idaho, LLC
PO Box 9693
Arnold, MD  21012yu77

Timely Filing

Claims should be submitted within 365 days from date of service for consideration.  Providers should expect payment within 30 days after receipt of a clean claim.

General Claim Inquiries

Please call (855) 202-1808, Option 2.



**Provider Manual**

---

### *Provider Portal*

CENTURION OF IDAHO has a Provider Portal available through Availity Essentials through with Providers can submit claims. Please go to https://www.availity.com/Essentials-portal-registration to request access.

To check claim status or verify eligibility, please go to https://hpitpa.com/your-resources/for-providers/check-claims-eligibility/.

### *Unsatisfactory or Claim Payment Concerns*

If a Provider has a question or is not satisfied with the information they have received related to a claim, there are effective ways in which a Provider can contact CENTURION OF IDAHO program:

1. Submit a Corrected Claim.
2. Submit a "Request for Reconsideration".
3. Contact a CENTURION OF IDAHO Provider Relations Representative at (855) 202-1808, option 2.
4. Submit a Claim Dispute.

All disputed claims will be processed in compliance with the claims payment resolution procedure as described in the Provider Complaints section of this manual.

Appeals must be received within 90 days of initial claim payment or denial. Centurion will respond to the appeal within 30 days of receipt. Provider will then have 90 days to submit a second level appeal. Centurion will respond to the second level appeal within 30 days of receipt.

## Provider Relations Assistance

Providers may seek assistance through our regional office staff at (855) 202-1808, option 3.

### *Provider Updates*

To ensure that we can communicate with you effectively, and to avoid any possible delay in claim payment, it is important that you notify us, **in writing**, as soon as you are aware of any of the following situations:

Addition or termination of an office location.
Addition, change, or termination of Tax Identification Number (W-9 required).
Name change (W-9 may be required).
Change in ownership.
Change in a phone number, fax, or e-mail address.

---



**Provider Manual**

Change in office hours, panel capacity, or age limitation

## *Provider Complaints*

Providers have the right to initiate a formal complaint regarding dissatisfaction with CENTURION OF IDAHO administrative policy or process.  Please contact our regional office at (855) 202-1808, option 3 and ask to speak with the Vice President of Operations who can help you process your concern. Adverse decisions for medical services and or procedures will be reviewed by the CENTURION OF IDAHO Statewide Medical Director or the appropriate qualified medical professional(s). Provider complaints related to a medical management decision, including expressing dissatisfaction with a decision, will be handled at time of receipt.  Please call the statewide medical director at (855) 202-1808, option 3 to discuss your concern.

# CENTURION OF IDAHO Pharmacy Program

CENTURION OF IDAHO will facilitate the administration of prescription drugs for IDOC residents that are ordered as part of their on-site treatment plan.  IDOC utilizes a formulary for provision of IDOC healthcare services.  Providers are encouraged to use the approved formulary.  Please contact the CENTURION OF IDAHO Regional Office for a copy of the current formulary.  When making recommendations for medications as part of the resident patient's treatment plan, we ask that providers be knowledgeable and understanding that medications that can be easily abused or offer 'benefits' from the resident standpoint, i.e., abusable narcotics, (resident can get a 'high' from them) can only be recommended when the provider feels that the medication is the most medically appropriate.  If medications are recommended in your treatment plan that are not on the current CENTURION OF IDAHO/IDOC formulary, the on-site practitioner will review the request and obtaining the recommended medication will require the on-site practitioner to obtain non-formulary approval. So, again, it is important to familiarize yourself and any other treating staff with the formulary.

Our on-site healthcare staff is responsible for ordering, managing and administering all medications ordered for residents in the institution. Since on-site medications are obtained through the IDOC pharmacy, it is not necessary for off-site providers to send an extended supply of medication back to the correctional facility with a resident.

## *Pharmacy and Therapeutics (P&T) Committee*

The CENTURION OF IDAHO P&T Committee continually evaluates the therapeutic classes included on the formulary.  The committee is composed of the CENTURION OF IDAHO Statewide Medical Director, Pharmacy Program Director, IDOC Clinical Director and CENTURION OF IDAHO site Medical Director(s) and other appropriate medical professionals.  The primary purpose of the committee is to assist in developing and monitoring the CENTURION OF IDAHO formulary and to establish programs and procedures that promote the appropriate and cost-effective use of medications. The P&T Committee



**Provider Manual**

schedules meetings at least quarterly.

# Medical Records

## *Overview*

CENTURION OF IDAHO Providers must keep accurate and complete medical records that comply with all statutory and regulatory requirements.  CENTURION OF IDAHO primary care providers maintain medical records for all residents.  Timely and complete provision of care information specific to resident patient services allows CENTURION OF IDAHO on-site medical practitioners to make informed care decisions and maintain continuity of care.  Also, maintenance of records by you as the Provider will enable provision of quality healthcare service to IDOC resident patients. Specialty providers are expected to provide copies of records of services provided by the specialist for inclusion in the resident comprehensive medical record maintained at the prison site.

CENTURION OF IDAHO uses Provider medical record information as an avenue to review the quality and appropriateness of the services rendered.  Provision of privacy and confidentiality of records for care provided to resident patients is no different than the requirements for any patient you provide services for in the community.  Idaho administrative regulations require Providers to maintain all records for at least 10 years after the date of medical services for which claims are made, or the date services were prescribed.  Specialty physician will not provide copies of medical records to residents. If a resident requests a copy of his medical record the specialists should refer the resident to the Health Services Administrator at the prison.

## *Release of Medical Records*

All resident patient medical records shall be confidential, and shall not be released without written authorization.  All requests for medical records should be referred the Health Service Administrator at the prison.  Residents cannot be provided copies or originals of medical records information by any treating Provider or Facility. IDOC policy for acquiring medical records must be followed.

## *Medical Records Audits*

CENTURION OF IDAHO routinely audits medical records maintained at the prisons including documentation provided by specialists and hospitals. CENTURION OF IDAHO may contact providers if the audit results raise questions about medical documentation provided by the specialist or hospital.



**Provider Manual**

# CENTURION OF IDAHO Utilization Management Department

## *Overview and Medical Necessity*

The CENTURION OF IDAHO Utilization Management Department hours of operation are Monday through Friday (excluding holidays) from 8:00 a.m. to 5:00 p.m.  Authorization may be requested via telephone or fax.

For telephone authorizations during business hours, the Provider should contact:

Prior Authorization
(855) 202-1808, option 1
Inpatient Concurrent Review (855) 202-1808, option 1

The CENTURION OF IDAHO Utilization Management (UM) Program is designed to ensure residents receive access to the right care, at the right place, and at the right time. Our program is comprehensive in scope to ensure services provided are medically necessary, appropriate to the resident's condition, rendered in the most appropriate setting, timely, and meet nationally recognized standards of care.

CENTURION OF IDAHO's UM Program includes:

- Prior Authorization
- Concurrent Review
- Retrospective Review
- Discharge Coordination
- Complex Case Management
- Assistance with Complex Medical Release Cases

Our utilization management program goals include:

- Healthcare based on evidence-based guidelines/practice
- Monitoring utilization patterns to guard against over or under utilization
- Development and distribution of clinical practice guidelines to Providers to promote improved clinical outcomes and satisfaction
- Identification and provision of intensive care and/or disease management for residents at risk or with complex care needs
- Education of Providers to promote improved clinical outcomes
- Coordination of care with sites to ensure implementation of programs that encourage preventive services and proactive management of chronic condition and focus on self-management
- Focus on early identification and management of residents with complex care needs



**Provider Manual**

- Creation of partnerships with Providers to enhance cooperation and support for UM program goals.
- Coordinated discharge planning program to ensure appropriate utilization of on-site infirmary and specialized care units in order to minimize hospital length of stays

## Prior Authorization Overview

For CENTURION OF IDAHO, the prior authorization process is driven by the on-site Medical Director or practitioner at the individual correctional facility. The on-site practitioners will initiate all requests for provision of specialty services to include any additional follow-up care or treatment recommended based on a specialty provider evaluation or follow-up visit. The on-site practitioner may request additional clinical input from the specialty provider to document medical need for requested service(s).

CENTURION OF IDAHO considers prior authorization as a request to CENTURION OF IDAHO's Utilization Management Department for determination of medical necessity for elective services on the Prior Authorization List. This process requires completion and approval prior to the service being scheduled/delivered.

Therefore, a resident should never automatically be scheduled by the specialty provider for a follow-up visit. Follow-up appointments and requests for additional services are managed by the on-site Medical Director and practitioners.

CENTURION OF IDAHO requires Prior Authorization for certain inpatient and outpatient services and treatments, as well as treatment at CENTURION OF IDAHO Designated Tertiary Facilities or when treated by Providers practicing in affiliation with those facilities.

Always contact the CENTURION OF IDAHO Utilization Management Department if there is any doubt about whether or not a service requires Prior Authorization or has been already been pre-authorized.

## On-Site Practitioner Referral for Specialty Service

CENTURION OF IDAHO's expectation is that on-site practitioners coordinate all ongoing healthcare services. CENTURION OF IDAHO requires a referral and prior authorization for all specialty services prior to the service being scheduled and/or provided if the service is routine or urgent in nature. Prior Authorization number will be provided by the CENTURION OF IDAHO clinical scheduling staff at the time of appointment scheduling if prior authorization is required in order to provide coverage for referrals to all specialists

CENTURION OF IDAHO requires that all specialty providers submit feedback to the referring on-site CENTURION OF IDAHO practitioner, in writing, that provides the practitioner the outcome of the examination, tests performed or recommended, and/or any treatment recommendations. Written report should include any discussion, education provided directly to the resident patient regarding



**Provider Manual**

recommendations

### Specialist Referral to Specialist for Treatment or Second Opinion

When medically necessary services are beyond the scope of the Specialist's practice, or, when a second opinion is requested, the Specialist must collaborate with the CENTURION OF IDAHO on-site practitioner. The CENTURION OF IDAHO practitioner will be responsible for requesting authorization for the service.

### Process to Request Follow-Up Specialty Services

Specialist should contact the CENTURION OF IDAHO referring on-site practitioner for discussion regarding additional service recommendations requested during an active appointment. Failure to contact the referring practitioner and/or CENTURION OF IDAHO utilization management staff for prior authorization of additional services may result in non-payment of those services.

### Self-Directed Care

Residents are not allowed to self-direct care. All services provided must be approved by CENTURION OF IDAHO. If your office is contacted directly by a resident, please contact our Utilization Management Department immediately to request clarification of the patient's eligibility. Residents, upon release, are allowed to use any community provider; however, once released from the facility, CENTURION OF IDAHO will no longer be responsible for cost of services.

### Prior Authorization Response Timeline

Routine Prior Authorization Requests:

- Decisions shall be made in an expedient manner after receipt of all information necessary to make a decision
- The requesting practitioner will be called within 24 hours of the decision
- Written notice of an approval is sent to the practitioner and site Healthcare Services Unit within two business days of the verbal notification

Expedited Prior Authorization Requests:

- Decisions will be made as soon as possible taking into account medical urgency and always within one business day
- The requesting practitioner will be called within one business day of the decision
- Written notice of an approval is sent to the practitioner and site Healthcare Services Unit within two business days of the verbal notification
- Notification of an adverse determination is sent to the practitioner and site Healthcare Unit



**Provider Manual**

within 24 hours after the decision and no later than 72 hours after the receipt of the request
• The decision timeframe may be extended if necessary, once, up to 48 hours if CENTURION OF IDAHO utilization management staff is unable to render a determination based on lack of information required to complete the review.

## *Medical Necessity*

CENTURION OF IDAHO defines Medical Necessity as healthcare services that are consistent with generally accepted principles of professional medical practice as determined by whether:

a) The service or level of service is the most appropriate available considering potential benefits and harms to the resident patient
b) Service is known to be effective, based on scientific evidence, professional standards and expert opinion in improving health outcomes
c) For services and interventions not in widespread use, services are based on scientific evidence and are the least intensive and most cost-effective available.

## *Review Criteria*

CENTURION OF IDAHO has adopted the utilization review criteria developed by Change Healthcare InterQual Products Specialists representing a national panel from community-based and academic practice, to determine Medical Necessity for non-emergency inpatient and outpatient services.

InterQual criteria are applied to:
• Medical and surgical admissions
• Select outpatient procedures
• Ancillary services

Criteria are established, periodically evaluated and updated with appropriate involvement from physicians of Centurion's Utilization Management Services and the Centurion Quality Improvement Committee.  InterQual is utilized as a screening guide and is not intended to be a substitute for practitioner judgment.  Utilization review decisions are made in accordance with currently accepted medical or healthcare practices, taking into account special circumstances of each case that may require deviation from the norm in the screening criteria.  Criteria are used for the approval of Medical Necessity, but not for the denial of services.  The CENTURION OF IDAHO Statewide Medical Director or designee is the only individual authorized to make adverse determinations.

Providers may request an appeal related to a Medical Necessity decision made during the authorization or concurrent review process. The appeal may be submitted at (855) 202-1808, option 1.



**Provider Manual**

## Requirements for Providers to Notify CENTURION OF IDAHO Utilization Management Department

### *Emergency Services*

Prior authorization is not required; however, CENTURION OF IDAHO Utilization Management Department should be notified within one business day of admission to the Emergency Department and/or subsequent hospitalization secondary to the Emergency Department visit. Notification should include clinical information related to the emergency services and/or need for hospital admission.

### *Notification of Observation Stays*

It is the responsibility of the receiving hospital and/or Emergency Department to notify CENTURION OF IDAHO Utilization Management Department of all Observation Stays.

Definition of Observation Stay

- If a resident patient's clinical symptoms do not meet criteria for an inpatient admission, but the treating Physician believes that allowing the resident patient to leave the facility would likely put the resident patient at serious risk, he/she may be admitted to the facility for an Observation Stay. Such stays should be reviewed with the CENTURION OF IDAHO on-site or on-call practitioner or CENTURION OF IDAHO Utilization Management Department (Monday through Friday during business hours) to obtain authorization for inpatient stay and initiate discharge planning discussions to ensure resident patient care cannot be managed by an on-site IDOC infirmary
- Observation Services are those services furnished on a hospital's premises, including use of a bed and periodic monitoring by a hospital's nurse or other staff
- These services are reasonable and necessary to:
  - Evaluate an acutely ill condition
  - Determine the need for a possible inpatient hospital admission
  - Provide aggressive treatment for an acute condition.
- Observation stays may last a maximum of **47** hours and **59** minutes
  - By the end of the 47 hour 59 minute observation stay, the resident patient should either be admitted as an inpatient or discharged back to the correctional facility as medically appropriate.
- If a resident patient begins treatment in observation status and then transitions to an inpatient stay, all incurred observation charges and services will be rolled into the acute inpatient reimbursement rate, or as designated by the contractual arrangement with CENTURION OF IDAHO. Observation is not separately reimbursed when the stay results in an inpatient admission.



**Provider Manual**

## *Concurrent Review*

CENTURION OF IDAHO utilization management (UM) staff performs ongoing concurrent review for all inpatient admissions. CENTURION OF IDAHO UM staff will review the treatment and status of all resident patients receiving inpatient services through contact with the hospital's Care Management Department and the attending Physician, when necessary.  On-site and telephonic models are utilized to conduct utilization review in collaboration with the hospital Care Management Department.

An inpatient stay will be reviewed as indicated by the diagnosis and response to treatment. The review will include evaluation of the current status, proposed plan of care, discharge plan, and any subsequent diagnostic testing or procedures.

Inpatient concurrent review authorization decisions are made within one business day of receipt of all necessary information and Providers are verbally informed of the decision within one business day of the decision.  Written or electronic notification includes the number of days of service approved, and the next review date.

In the case of a denial of service days:

- Written notices are sent within one business day of the verbal notification
- All existing approved services will be continued without liability to the Provider until the Provider has been notified of an adverse determination
- CENTURION OF IDAHO UM staff will work directly with the hospital's Care Management Department to facilitate discharge back to an appropriate IDOC level of care facility
- Notices will contain information on how to appeal

## *Discharge Planning*

Discharge planning activities are expected to be initiated upon admission. The CENTURION OF IDAHO UM staff will coordinate the discharge planning efforts with the hospital's Care Management Department, and when necessary, the attending Physician in order to ensure that resident patient receives appropriate post-hospital discharge care.  It should be noted that IDOC infirmaries can provide a skilled level of services to resident patients supporting earlier discharges from the hospital.

Hospital Care Management Departments are encouraged to develop understanding of level of care and services that can be provided by CENTURION OF IDAHO/IDOC on-site infirmaries.  This level of understanding will assist in promoting coordination of discharge planning with CENTURION OF IDAHO UM staff.



**Provider Manual**

### *Retrospective Review*

Retrospective review occurs when an initial review of the services provided to a resident patient occurs after the date of service.  This is sometimes necessary because authorization and/or timely notification were not obtained prior to the service delivery due to extenuating circumstances.

Routinely this process encompasses services performed by a Provider when there was no opportunity for concurrent review. However, retrospective review is also performed on active cases where an appropriate authorization decision cannot be made concurrently within the required timeframe due to lack of clinical information. For cases that qualify for a retrospective review, a decision is made within 30 calendar days of receipt of all necessary information.

## Summary

The information presented in this Provider Manual is meant to present to Specialty providers and their staff an overview of coordinating services with CENTURION OF IDAHO.  Specific questions should be directed to CENTURION OF IDAHO Utilization Management Department staff.